[No. 33866.   Department One.   May 29, 1958.]

WILLIAMS TILT-UP CONTRACTORS, INC., *Respondent*, v.
ALFRED SCHMID *et al., Appellants.*[1]

[1]Reported in 326 P. (2d) 41.

*Melville Oseran*, for appellant.

*William A. Herren* and *Deane W. Parker*, for respondent.

HILL, C. J.—This is a controversy between a subcontractor and a general contractor arising out of work done, or not done, in connection with two subcontracts involved in the construction of a depot warehouse in Alaska for the United States government.

The general contractor terminated the subcontracts and completed the work. The subcontractor, contending that the subcontracts were wrongfully terminated, sues in one action for the amount due on each contract at the time of the termination thereof and an additional five thousand dollars, which was to be paid if the direct costs on the two subcontracts exceeded the amount of the subcontracts, together with certain extras alleged to have been furnished at the special instance and request of the general contractor. The subcontractor also sues, in a separate but consolidated action, for the conversion by the general contractor—to his own use—of certain equipment which the subcontractor had left on the job in the possession of the general contractor at the time the subcontracts were terminated.

The issues are for the most part factual and call for the application of the familiar principle that we will not

disturb the findings of the trial court, unless there is no credible evidence to sustain them, or unless the evidence clearly preponderates against them. *Nelson Equipment Co. v. Estep* (1957), 50 Wn. (2d) 612, 313 P. (2d) 679.

The first issue of fact, in point of importance, was whether the general contractor was within his rights in terminating the subcontracts. The trial court found, on sharply conflicting evidence, that the action of the general contractor in terminating the subcontracts and taking over their completion "was without cause or justification." This finding disposed of the general contractor's cross-complaint for the cost of completing the subcontracts, over and above the amount fixed in the subcontracts.

The second issue of fact, in point of importance, was the percentage of completion of the subcontracts at the time of their termination by the general contractor. Again, on sharply conflicting evidence, the trial court found that the subcontractor had completed 96.6 per cent of the work required under one subcontract and 93.1 per cent of the work required under the other. This finding determined the amount due under the subcontracts to the subcontractor. The finding that the subcontractor's direct costs, exclusive of extras, amounted to $143,940.95 was decisive of the subcontractor's right to the additional five thousand dollars. This leaves for our consideration (exclusive of the conversion action) only the amount of some forty items of claimed extras (twenty-five items were referred to in the bill of particulars, but the twenty-fifth item was itself made up of sixteen separate items which we will refer to as subitems).

Of the first twenty-four items of extras, the trial court found with the general contractor and against the subcontractor on only two items; on the other twenty-two items, the trial court found for the subcontractor in the amount claimed; but in many of these the amount claimed was conceded and, actually, only eleven items are in controversy. The general contractor conceded that some amount was due on all but two of these eleven controverted items.

Of the sixteen separate subitems, which made up the twenty-fifth item, the trial court found with the general

contractor and against the subcontractor on five subitems, which left eleven subitems in controversy. Because of the general contractor's insistence that the evidence preponderated against the findings of the trial court, we have assayed the evidence in support of these twenty-two claimed extras, and have found support for the trial court's findings on all except three items and three subitems.

The largest amount involved is a claim for twenty thousand dollars for equipment rental, which is subitem 16 of item 25. We are satisfied that the evidence clearly preponderates against the finding that twenty thousand dollars, paid by the subcontractor to S & S Enterprises (for equipment rental), was an extra for which the general contractor had agreed to pay or was obligated to pay.

In December, 1953, the subcontractor had submitted a bid covering the construction and placing of the concrete walls by its "Tilt-Up" process, which had been accepted.

On February 24, 1954, the subcontractor had submitted a bid covering the balance of the concrete work (principally the floor). This bid contained an item for concrete placement in the amount of $33,083, which did not include the furnishing of any equipment by the subcontractor. This bid was not accepted, but, after discussion with the general contractor, a new bid was submitted on March 3, 1954, and the amount of the bid for concrete placement was increased almost $21,000—to $54,019.24—with the subcontractor agreeing to furnish the necessary equipment.

That bid was accepted, and the subcontract, which obligated the subcontractor "to furnish all equipment . . . for the work specified . . . ," was signed March 4, 1954. The same day, the subcontractor entered into a written agreement under which it agreed to pay S & S Enterprises twenty thousand dollars for the use and rental of certain listed equipment and material. That amount was paid and is the amount the subcontractor seeks to recover as an extra.

We find no basis in the record for the allowance of the item of twenty thousand dollars for equipment rental as an extra, except the unsupported statement of the presi-

dent of the subcontractor that the representative who signed the subcontracts on behalf of the general contractor told him, "I will reimburse you for this $20,000 equipment rental as an extra."

Aside from any consideration of the parol evidence rule, which was invoked to keep out the proferred testimony of the representative of the general contractor as to this item and relaxed to admit the testimony of the representative of the subcontractor, the written documents, to which we have here referred, constituted evidence which overwhelmingly preponderates against that offered in support of the subcontractor's claim for a twenty-thousand-dollar extra for equipment rental. The allowance by the trial court for extras must be reduced by this item of twenty thousand dollars.

The other items and subitems, on which the trial court erred, are not of sufficient importance to warrant extended discussion. Our conclusions are of interest only to the litigants, and we shall identify the items by the same numbers used in the briefs.

Item 1: The subcontractor claimed an extra in the amount of $522.92. The general contractor admitted this extra in the amount of $505.53. The trial court found for the subcontractor for the full amount claimed, but on this appeal the subcontractor concedes that it is not claiming any amount greater than $505.53. The amount allowed for extras must be reduced by $17.39.

Item 19: The repair of a cement finishing machine, in the amount of $15.45, was never approved by any representative of the general contractor. This equipment was rented by the subcontractor from S & S Enterprises, and, contrary to the subcontractor's contention, S & S Enterprises and the general contractors are not identical, and one is not the alter ego of the other. The amount allowed for extras must be reduced $15.45.

Item 23: The purchase of stove oil and toilet paper in the sum of $34.60 was never authorized or approved by the general contractor. The president of the subcontractor tes-

tified that "Specifications for the contract with the United States Army Corps of Engineers" required the general or prime contractor to supply these items. In its brief, the subcontractor says: "These items were required to be furnished by the general contractor under government specifications (Ex. 12-A-B-C)."

The exhibits referred to contain several hundred pages. It is comparable to making a statement and then, for support of its authenticity, saying, "See statement of facts." The subcontractor failed to establish its right to this item as an extra with sufficient particularity. The amount allowed for extras must be reduced $34.60.

Subitem 4 of item 25: This is a charge of $78.04 for $24\frac{1}{2}$ hours of labor, as to which, as the general contractor states in his brief, there is no "shred of evidence" to explain why this item should be allowed as an extra. The amount allowed for extras must be reduced $78.04.

Subitem 7 of item 25: This is a claim for six dollars for two safety lines, which a government inspector required the subcontractor to procure in order to protect its own employees against a condition of its own creation. We find no evidence which warrants charging this subitem against the general contractor as an extra.

There were other items claimed as extras, as to which we might have differed with the trial court as to the conclusion reached, but there was credible evidence supporting the finding that each was an extra, and in no instance could we say that the evidence clearly preponderated against the finding.

There are certain subitems, and item 24, where the general contractor urges that he is not liable for the extras because no claim was made for the extras within one week as required by the terms of the subcontract.

The only item of importance in which this issue is raised, and in which we hold the general contractor to be liable, is item 24, which involves overtime pay on Saturday, September 11, 1954.

The trial court could find the general contractor specifically agreed to pay the overtime. If it did, there was

clearly a waiver of the filing of a claim as required by the subcontract. *Morango v. Phillips* (1949), 33 Wn. (2d) 351, pp. 357, 358, 205 P. (2d) 892; *Eggers v. Luster* (1948), 32 Wn. (2d) 86, pp. 93, 94, 200 P. (2d) 520.

The extras will be reduced by the amounts indicated, *i.e.*, a total of $20,151.48, so that the total amount allowed for extra work, materials, and other services furnished at the request of the general contractor will be $18,301.32. The result will be a reduction in the amount of the judgment in the action on the subcontracts from $24,839.95 to $4,688.47.

There remains for consideration the conversion action. This relates to certain equipment belonging to the subcontractor and left on the job site when the subcontractor left and the general contractor took over the completion of the work. At that time, the following document (exhibit No. 15) was executed by Fred Schmid on behalf of the general contractor, and Arthur E. Williams on behalf of the subcontractor:

"September 14th 1954
Anchorage, Alaska

"To Whom It May Concern:
We hereby agree to accept the full Responsibility of all Equipment And Lifting Gear of all braces, of all Lifting Pads, Impact Wrenches and pertinent Items used on the Contract No: DA-95-507-54-12. General Depot Warehouse, Ft. Richardson, Alaska. That the firm of Williams Tilt-up Contractors, Inc. are leaving in our care and control. It is the intent of the signators that they will be responsible for the care and of the maintenance of all and any related items that are carried by Inventory.
I. Schmid & Lewis Construction Co. Will assume the cost of this maintenance and of a reasonable rental rate thereof agreed upon as being 10% of the cost of said Items and payable within 30 days of date.

"Yours Very Truly,
*Fred Schmid* (signed)
Fred Schmid
Schmid & Lewis Construction Co."

The following day, Marvin E. Smith, general superintendent for the general contractor, signed a notation on

the margin of the inventory (exhibit No. 16), to which reference was made in the document from which we have just quoted. We quote the notation:

"Inventory Left by Williams-tilt up-Contractors in the care of Schmid & Lewis Const. Co. 9/15/54—Signed for by Marvin E. Smith."

The general contractor thereby acknowledged the receipt of the equipment described in that inventory.

The general contractor contends that he was entitled to the possession of the property claimed to have been converted on every date on which demand was made, placing reliance on what he calls a rental agreement. Despite its continued possession, no rent was ever tendered "within thirty days of date" or at all. No time for possession by the general contractor is stated in the so-called "rental agreement." It could be terminated on demand by the subcontractor as the owner of the equipment; the arguments to the contrary by the general contractor are not persuasive.

▆ We find no evidence supporting the finding that the general contractor refused to allow the subcontractor to remove its machinery and equipment when the subcontracts were terminated; but that is not material, if the general contractor thereafter refused to surrender possession when demand was made for such machinery and equipment by the subcontractor at a time when it was entitled to possession. The findings of the trial court in the conversion action, having adequate support in the evidence, warranted a conclusion of law that there had been a conversion on October 9, 1954, the date of the last demand.

▆ The general contractor placed reliance on the bill of sale from the subcontractor, covering the most valuable part of the equipment, which was dated July 16, 1954. The evidence, while sharply conflicting, does not preponderate against the trial court's finding that it

" . . . was never intended to be a bill of sale and was not in fact a bill of sale but only collateral to secure any progress payments made in advance of actual progress."

The trial court specifically found that the general contractors had requested that the bill of sale be executed before any progress payments would be made; that the subcontractor executed it for the limited purpose indicated; and that no payments in advance of actual progress were ever made.

The one factual issue in the conversion action that has caused the court any concern is as to the sufficiency of the evidence to support the finding that the market value of the equipment converted was the sum of $7,626.60. That finding must stand or fall on the testimony of A. E. Williams, the president of the subcontractor. On direct examination, he placed a value on the equipment involved, item by item, as shown in the "Price" column of the inventory (exhibit No. 16). The total of the price column was $7,626.60. Then he testified as follows:

"Q. A total valuation of $7,626.60? A. Yes. Q. was that the reasonable market value of those items at the time they refused to return them to you? A. That was our wholesale value. Q. That was the reasonable market value at the time they refused to return them to you? A. Yes, sir."

On cross-examination, it developed that figures in the price column represented the price at which the respective items had been purchased by the subcontractor. Some items were purchased in the latter part of 1953; others during the first eight months of 1954; all had been used on the job in question; much of it was purchased in Seattle and transported from Seattle to the job site near Anchorage, Alaska, though some of it was purchased in Anchorage. We are not advised as to whether or not the market value of articles purchased in Seattle and shipped to Anchorage, Alaska, may have been increased upon the completion of such transportation. It developed, on cross-examination, that the purchase price of two hundred braces, which accounted for $3,600 of the $7,626.60, had been depreciated one hundred per cent and entirely charged off as a direct cost of the job by the subcontractor. It is urged by the subcontractor that this item of depreciation was for tax purposes and had no bearing on the market value of the braces.

It must be confessed that there are members of the court, including the writer of this opinion, who are doubtful whether the market value of this equipment at the time of the conversion was $7,626.60. The trial court, however, believed Mr. Williams' testimony, which we have quoted; and the general contractor, apparently relying on the destructive force of the cross-examination on Mr. Williams' credibility, introduced no evidence on the issue of value. We have, therefore, nothing to confirm the doubts raised by the cross-examination; we cannot say that the evidence preponderates against the finding of the trial court that the market value of the equipment of the subcontractor, converted to its own use by the general contractor, was $7,-626.60.

The judgment of the trial court in the conversion action is affirmed; the judgment of the trial court in the action on the subcontracts is modified, as herein indicated, and reduced to $4,688.47. Both parties having been partially successful on this appeal, they will bear their own costs, except that to somewhat equalize the cost of the appeal, the respondent will pay one-half of the cost of the statement of facts and the cost of that portion of the transcript relating to the action on the subcontracts, with reference to which the appellants obtained substantial relief.

MALLERY, FINLEY, OTT, and HUNTER, JJ., concur.