[No. 34589. *En Banc.* November 19, 1959.]

*In the Matter of the Adoption of* JANETTE REINIUS *and* NANETTE REINIUS, *Minors.*[1]

[1]Reported in 346 P. (2d) 672.

*Arthur G. Barnett* and *Hugo Metzler, Jr.,* for appellant.

*Metzger, Blair & Gardner,* for respondents.

FINLEY, J.—In this appeal the appellant, Washington Children's Home Society, challenges the validity of a decree of adoption.

The two minors in question are twins, born in September 1956 to an unmarried mother. She requested aid from the Pierce county welfare department in caring for the two minor children. It was anticipated that the mother would promptly sign a relinquishment and consent to adoption; the children were placed in separate foster homes pending such action. However, the mother did not consent to adoption until July 1957.

In September 1957, the juvenile court, by an appropriate order, placed the twins in the custody of the Washington Children's Home Society (hereafter referred to as the Society) for the *purpose of adoption.* The effect of this order was to make the Society the "custodial guardian" of the children. In October 1957, the respondents herein, Howard Pelland and Edythe Pelland, husband and wife, who, by appropriate administrative action, had become *foster parents* for one of the twins *and were being paid for such services at public expense,* petitioned to adopt both of the twins. They did not request the Society to consent to the

contemplated adoption. Actually, in becoming foster parents, they orally agreed that they would not attempt to adopt the minor placed in their care.[2] When the Society

[2]It should be noted with emphasis and real significance that people who meet reasonably appropriate standards and are adequate as foster parents for temporary or transitory care and custody of very young children are not necessarily adequate as adoptive parents, because of age or other factors. As a matter of fact, child placement with foster parents, almost without exception, is supposed to be temporary and transitory and, usually, is understood by all concerned to be so. On the other hand, for the purpose of *permanent placement*, the Society, or other comparable child-care agencies, makes a careful and expert study of prospective adoptive parents and attempts to make *permanent placements* of minor children in homes which will be consistent with age, race, and religion, as well as other factors, in terms of the *best interests* and welfare of the child. The foregoing certainly implies no criticism of the foster home parents in the instant case or of the many middle-aged and older people who participate in the foster home care program and render most valuable services to many unfortunate minor children in need of temporary child-care services in our state. It is merely a recognition of the fact that foster home parents are selected to provide temporary transitory care. They can and do function effectively in this particular respect. They are not selected or expected to provide permanent care and custody. The considerations, applicable and controlling as to the two different situations, are simply not the same.

The 1958 report of the Washington Children's Home Society reads, in part, as follows:

"In 1958 the Society provided 44,812 days' care for infants and children in foster family homes. An average of 123 children were cared for at all times. Most of the children stayed in foster homes less than three months before going to their new and permanent families, or returning to their homes.

"We at the Washington Children's Home Society are much involved with babies. Of the 341 youngsters placed for adoption last year (a record), 281 were less than a year old. Many of these infants went to their permanent homes at less than one month of age.

"The needs of the children past infancy are even more pressing. More homes are always needed for older children, including brothers and sisters who should stay together. Forty of the children placed were from one to six, and twenty were older. Seventy-two of the infants and older children placed were of minority or mixed race.

"More applications to adopt children were received than ever before. The year began with 340 couples on the waiting list; 582 applications were received, and 371 families were waiting at the beginning of 1959. Six out of seven of the applications received were accepted for complete study. Three out of five families accepted for study received children. (One family in five withdraws its application and it is necessary for the Society to decide against placing a child with one family in five.)

learned about the action of the foster parents in breach of the oral agreement and in violation of approved standards respecting foster home care, it intervened to oppose the petition for adoption.

After a hearing on the petition for adoption (filed by the foster parents), the trial court approved the petition and entered a decree of adoption and an order dispensing with the Society's consent.

Basically, it is the position of the Society that the adoption statutes, as amended, permit dispensing with the requirement of its consent respecting a proposed adoption, *only* in the exercise of sound judicial discretion; that the action of the trial court in the instant case was arbitrary and an abuse of discretion rather than a proper exercise of sound judicial discretion.

For a proper understanding of the issue presented, it is necessary to examine carefully and in proper context the purposes of the adoption statutes, earlier adoption statutes, and cases construing the earlier statutes.

█ We believe that the purpose of our modern adoption statute, Laws of 1955, ch. 291, p. 1299 [*cf.* RCW 26.32], is the threefold protection of: (1) the adoptive child—from unnecessary separation from his natural parents and from adoption by persons unfit, unsuited, or unqualified to have the responsibility of the particular child; (2) the natural parents—from hurried and abrupt decisions to relinquish custody of their children; and (3) the adopting parents—from unhappiness, embarrassment and heartache, by providing them with information about the particular child and his background, and by protecting them and the child from subsequent disturbance of family relationships by the natural parents. See The Law of Adoption: *Ancient and Modern,* 9 Vanderbilt L. Rev. 743 (1955-56).

█ It is the function and responsibility of the courts to

"The average waiting time was reduced still further—to less than 10 months for families receiving infants, and to an even shorter time for those adopting older children. Two-thirds of the 331 [or 221] families who received children waited less than one year after making application."

see that the adoption statute is so administered that it works in practice in a manner that recognizes and implements the above indicated purposes of this modern and socially desirable legislative enactment. The extent to which this is accomplished, generally speaking, determines whether sound judicial discretion has been exercised in particular adoption cases.

The Child Welfare League of America has promulgated a code of approved standards or procedures for use in the adoption placement of children. (Pamphlet entitled, *Child Welfare League of America Standards for Adoption Service,* published 1958). These standards are not the notions of any one individual. They are a composite of the experience, research and study of many people working over a period of many years with many private and public agencies handling adoptions throughout the country. The standards offer general information and some specifics to which a judge may turn for guidance in his effort to exercise sound judicial discretion in handling a particular adoption.

The problem of an appellate court in reviewing adoption cases such as the case at bar is not a simple one. It would be most helpful—and, perhaps, in some cases decisive respecting affirmance or reversal—to have detailed findings of fact made by the trial judge, indicating those factors he considered significant or determinative; among other things, whether approved adoption standards were referred to, and the extent to which the trial court recognized and attempted to follow and effectuate these standards.

The contentions advanced herein by appellant Society were presented to the court in *State ex rel. Van Cleave v. Frater* (1944), 21 Wn. (2d) 231, 150 P. (2d) 391. However, in the *Van Cleave* case the court was interpreting and applying the adoption statutes (Laws of 1943, ch. 268, § 3, p. 828) as then enacted. In the *Van Cleave* case the court merely held that under the existing statutes written consent need be filed prior to a hearing on the merits of the petition *only* (1) by the children, if fourteen years of age, or over; (2)

by the parents of legitimate children; (3) by the mother of illegitimate children; and (4) by the legal guardian, if any. Since the approved adoption agency was not within the above categories, its written consent was held to be unnecessary.

Thereafter, the legislature amended the adoption laws by adding a fifth subsection to § 3, ch. 268, Laws of 1943 (see Laws of 1947, ch. 251, § 1, p. 1038). In 1955, the legislature enacted a new adoption law: Laws of 1955, ch. 291, p. 1299. The pertinent language in § 3 of that statute reads as follows:

"Sec. 3. Written consent to such adoption *must be* filed prior to a hearing on the petition, as follows:
" . . .

"(5) If the person to be adopted is a minor and has been permanently committed upon due notice to his parents by any court of general jurisdiction *to an approved agency, then by such approved agency, in which event neither notice to nor consent by its parents in the adoption proceeding shall be necessary: Provided,* That if the approved agency refuses to consent to the adoption, the court, in its discretion, may order that such consent be dispensed with." (Italics ours.)

██ An "approved agency" means "any public or private association, corporation or individual who has custody of a minor child with lawful authority to place such child for adoption." Laws of 1955, ch. 291, § 1, p. 1299. In the case at bar, the Society meets the indicated qualifications.

Section 7(1) of the 1955 act, *supra,* reads:

"(1) The written consent shall be acknowledged before a notary public and filed with the petition *or at all events before any action is taken by the court* in such proceedings. . . ." (Italics ours.)

Section 5 of the 1955 act, *supra,* provides for a hearing for the purpose of determining whether the *consent of a parent* shall be dispensed with; upon proper notice and hearing, the court may order that such consent shall not be required prior to adoption.

██ In the light of the foregoing, we believe the legislature intended that, normally, where custody has been

given to an approved agency, the written consent of the approved agency should be on file before action is taken granting a petition for adoption. In fact, from our examination of the statutory provisions, as emphasized above, it would seem that when a child is placed with an "approved agency" for adoption, thereupon, the agency, as custodial guardian, in effect stands *in loco parentis* and takes the place of the natural parents or legal guardian of the child in regard to the matter of consent to an adoption, in order to safeguard the interests of the child.[3]   When an approved

---

[3] The writer of the majority opinion assumes full responsibility for referring to an interesting article appearing in 41 A. B. A. Journal 1125. The article stresses the importance of understanding the "role of the social agency in the adoption process." In the hope of aiding in that understanding, the writer of this opinion takes this opportunity to quote at some length from the article.

"In this age of increased understanding of human development, of interdisciplinary approach in identifying and eliminating the sources of human unhappiness and ill health, the responsibility of the lawyer [and the judge] in the adoption process must be viewed in perspective."

A lawyer or judge "who has observed some of the disastrous consequences of misguided adoptions, or attempts at adoption, knows the hazards involved. A substantial part of the legal profession is not generally aware of the nature and character of the social work profession, that it has developed special skills based on a body of knowledge developed over many years. This is true not only in relation to adoptions but to many other fields of social service.

"A trained social worker has completed four years of college work and at least two years toward a master's degree which includes a year of supervised work, equivalent to an internship, in the field of her choice. For an adoption worker, usually an additional period of service in the field of child welfare is required. Not only trained social workers, but pediatrician, nursing staff, consultant psychiatrist, psychologist, lawyer and other specialists, called in as they are needed, are included on the staff of the larger agencies.

"   .   .   .

"Social agencies themselves have been highly critical of the slowness in processing adoption applications. The better agencies have pioneered in servicing adoption requests promptly. They have stripped their adoption service of all detail which diverts them from the main job of finding each child a permanent home by the time he is twelve weeks or younger, depending on his condition. They believe that couples are entitled to know rapidly whether their home can be used for a child, and they are entitled to be free of the stigma of being 'rejected applicants'. By knowing their children well and interviewing only a small number of families appropriate to these children each month, the need for cumbersome waiting lists is dispensed with. For the purposes of

agency, as the custodial guardian, refuses to file its written consent in an adoption proceeding, the statute contemplates a full hearing on the reasonableness of its action. If the custodial guardian is unreasonable in the withholding of its

---

this discussion, it may be well to review the way in which adoption is handled in a recognized agency of good standards."

Ideally, the children "would be placed in adoptive homes when released from the hospital. In practice, however, it is to the best interests of child and family to provide a period of observation. Some infants with full family history, whose mothers have gone through a normal pregnancy and delivery and whose condition at birth is good, can be placed very early. In other cases the period of longer observation under the care of a warm foster family, with continued supervision by a caseworker, periodic examination by pediatrician, psychologist, and other specialists as indicated, permit the agency to make some predictions as to the child's emerging personality and needs. Thus, knowing the babies who will be ready for adoption in a given month, the agency can interview only a few couples who seem to be natural parents for these children.

" . . .

"At what age is a couple old enough to rear a child to maturity, at what age too old? . . . The laws of biology were not developed by social workers. In placing children, social workers must give consideration not only to the present, but to the child's long maturing process. The capacity to respond with zest to the demanding years of boundless energy with which healthy children are endowed is not characteristic of the older age group. There are individual differences based on physical constitution, and rigid rules as to age can lead to injustice, but, in general, the best interests of the child require placement in younger families, families who are, however, considerably above the 20 to 24 year age bracket."

To find proper adoptive families, the adoptive couples are interviewed through friendly conversations relative to their feelings "about parenthood by adoption," and about their expectations for a child.

"In general, the couple selected will be one comfortable with each other, recognizing and accepting each other's faults, knowing and complementing each other's strengths. They are reasonably content with themselves and their way of life. Most important, they have faced their disappointment in not having a family naturally and can accept an adopted child for himself alone, for his own special characteristics, for the joys and problems any child presents.

" . . .

"Just as important as knowing and understanding the children they place is sympathetic understanding of the families they seek to help. When an agency has learned to know husband and wife reasonably well, has established the fact that they are physically healthy, and financially able to care for a child (standards here are modest), the

consent,—if it is not looking out for the best interests of the child—the court, of course, in the proper exercise of judicial discretion, may enter an order dispensing with the necessity of consent. See 39 Minn. L. Rev. 567, Adoption—*Consent of Guardian Where Custodial Guardian is a Charitable Child Placing Agency.* But the matter of consent of an approved agency cannot be dispensed with or ignored

prospective parents are told about the child who seems to share basic similarities with them. They are helped to understand his history, and this is done in ways which in later years will prove helpful to the child in achieving a sense of his own dignity and worth.

"In short, agencies are not seeking certified babies for certified families. They are seeking to understand in the shortest time consistent with the future well-being of the adopted family they are bringing together the special needs of the child, the special qualities of the family to whom society, through the auspices of a social agency, is entrusting a young baby to be reared to mature, effective adult life. Following placement, all casework efforts are directed toward helping families grow comfortably together, continuing contact with the family usually for a year following placement. At this time legal adoption is recommended with the family going to their own attorney, but the agency stands ready at all times, even following adoption consummation, to be of assistance to the adoptive family if this is requested."

Black marketing and gray marketing of babies, without such thorough investigative processes as outlined above, has led to many tragic cases "of adoptive parents who have had their child taken from them, long after placement, when a mother has changed her mind; adopted children who develop serious physical or mental defects; adopted children whose mixed racial background does not become apparent until it is too late to make a wise choice of family on the basis of the child's characteristics; and adopted children of low intelligence placed with adoptive parents having ambitions for the child which cannot be fulfilled.

"Many independent adoptions do work out successfully but the chances for this, according to the late Dr. Amatruda, for many years associated with Dr. Gesell in the Yale University Clinic of Child Development, are only 50 per cent.

"In short, an independent adoption has the same statistical ratio of success as chance.

" . . .

"The whole purpose of adoption is to bring together a family unit in which parents and children may find in each other a reasonable degree of pleasure. An adoptive placement must not be based upon vague fulfillment of a couple's longing for a child by placing any child in the home. It must be predicated upon the particular needs of an individual child, upon the characteristics of the family undertaking to rear him."

arbitrarily any more than it could be in the case of natural parents who refuse to consent to adoption of their offspring. In both instances, the welfare of the minor is the prime and controlling consideration—in fact, the only consideration. In that respect, the court "is the ultimate protector of helpless children." *State ex rel. Van Cleave v. Frater, supra.*

"Rights of adoption are created by statute, and in order to effect the adoption of a child, the procedure set up by the statute must be strictly followed. *In re Renton's Estate,* 10 Wash. 533, 39 Pac. 145; *In re Nelms,* 153 Wash 242, 279 Pac. 748; *In re a Minor,* 191 Wash. 452, 71 P. (2d) 385." *In re Blake* (1944), 21 Wn. (2d) 547, 151 P. (2d) 825.

In passing, it may be well to observe that there is no absolute necessity for a separate hearing on the issue of dispensing with the Society's consent. In other words, that matter and the petition for adoption may be determined in the same hearing. Whether there is a single hearing or separate hearings, however, there is an essential requirement of adequate notice and an opportunity for the Society to be fully heard. This, of course, assumes that sound judicial discretion, based upon an informed and unbiased judgment, shall be exercised as to the issue of dispensing with the consent of the approved adoptive agency.

It seems to us that the foregoing evaluation relative to the intent and purpose of the legislature in enacting § 3, chapter 291, Laws of 1955, finds support in common sense. In this connection, it may be well to remember and to emphasize that an approved adoptive agency obtains custody of a child for adoption purposes in the first instance only through appropriate court proceedings. Furthermore, *at such time,* the court has complete control of the situation. If there is any judicial doubt as to the competency of the approved agency, the court need be under no compulsion to place a child with that agency for adoptive purposes— and, of course, should refrain from doing so. However, *once the court makes the determination* that it is for the best interest and welfare of the child that such child be committed to the custody of the particular agency for adoptive purposes, *then it would seem logically compelling that the*

*agency should be given every reasonable opportunity,* and in this respect *should be supported by the courts* in its programming or actions designed to find proper adoptive parents and to place the child *permanently* with such parties for adoption.

The particular area in public administration of child welfare requires the closest of cooperation and understanding between the courts and the approved agencies. Neither can function effectively in the best interests of the large number of children in need of public child care services without the help and understanding of the other.

In our complex society, neither the courts nor the social agencies can do the work alone. It involves a mutual responsibility rather than a distinct and separate one. It is a responsibility and a function that must be understood and shared by the courts and the social agencies.[4]

---

[4]On the basis of information available, it seems very clear that foster home care and a workable foster home program for minors pending adoption is a most desirable alternative to institutional care for such minors pending their permanent placement with adoptive parents. If the rather extensive and supervised program of foster home care in our state is to function efficiently, and is to be relied upon and used by approved agencies as the most desirable method of providing temporary and transitory care for minors pending their permanent placement for adoption, all concerned must understand that foster home placement is temporary and transitory, and all concerned, including the foster parents, the courts, and the agencies, should be content to abide by reasonable standards and rules regarding the operation and functioning of the foster home care program. It is time consuming and costly for an approved agency to investigate prospective adoptive parents and to work with them on a prospective plan of adoption. Under the circumstances, it is not conducive to orderly and effective operation of the foster home care program to permit foster parents, who, understandably, may have become attached to children placed in their care, to interrupt and to set aside for naught a plan of adoption made by an approved agency.

In 1957, 2,248 adoptions were officially sanctioned by the courts of this state; 1,160 of these were cases where the adopter was *not* related to the adoptive child. Of this latter group, 58.9%, or 683, were processed and completed by the six approved adoptive agencies in this state as well as the state department of public assistance. (The six approved agencies are: Washington Children's Home Society; Medina Children's Service; Associated Lutheran Welfare; and three Catholic children's homes, operating in different parts of the state.) The foregoing statistics

With the above observations in mind, let us examine the circumstances surrounding the trial court's decision in the instant case. During the course of the hearing, the trial court did allow testimony to be introduced concerning the parents contemplated by the Society for these minor children. However, from reading his memorandum decision, it seems to us that the trial judge did not consider such evidence relevant; and that, in this connection, he gave little or no consideration to the investigative work and the planning by the Society in behalf of the twins. *Inter alia,* the memorandum decision states:

"Now, it should be borne in mind that when a petition for adoption is filed that this does not place in the public domain all of the issues to be determined or weighed at large by the public. In other words, when a petition for adoption is filed all other persons who might be interested in adopting the child can not be heard nor permitted to enter the arena and urge that they are more suitable or that they would be better adoptive parents. . . . The matter does not become a litigable one between the petitioners and the world at large.

" . . . The law governing adoptions does not grant unto welfare agencies or to private agencies the sole and exclusive power to deal with children or arrange for their adoption."

It appears to us that the trial court arbitrarily dispensed with the consent of the Society relative to the proposed adoption, asserting in the process (a) that the Society, its views and functions, in effect, had no more standing in court than any stranger from the "world at large," and (b) that in such matters the law gives "*sole and exclusive power,*" not to "approved agencies" (public or private), but to the courts. We cannot agree with this.

The legislature has seen fit to provide that the Society must consent to the adoption of any child placed in its custody. In this connection, the legislature has recog-

illustrate the socially significant function being performed by approved adoptive agencies in the placing of destitute minor children of our state in suitable homes.

nized that such consent may be dispensed with by order of the court in the exercise of *sound judicial discretion.* This certainly does not sanction arbitrary action. It contemplates, as indicated heretofore, the exercise of an informed judgment reasonably supported by the facts. In other words, consent may be dispensed with, but only where the trial court makes a determination, supportable by the facts, that such action is in the best interests of the minor child. The issue, then, is not solely whether the petitioning parents are fit. The trial court must, in the exercise of sound judicial discretion, determine further: whether it is in the best interests of the minor child to order that the Society's consent be dispensed with.

Since, from our examination of the record, the trial court seems to have been under the erroneous assumption that the only issue relative to dispensing with the Society's consent was the fitness of Mr. and Mrs. Pelland, adoption petitioners, this case must be reversed and remanded for further proceedings in full conformity with the views expressed herein. Pending such action, the status quo shall be maintained as to the minor children involved. It is so ordered.

WEAVER, C. J., HILL, ROSELLINI, FOSTER, and HUNTER, JJ., concur.

HILL, J. (concurring)—I concur in the majority opinion, and have signed it. I do desire, however, to pinpoint what is to me the area of disagreement.

I am not concerned with a controversy as to whether judges know more than social workers about the placing of children for adoption, or vice versa. It is true, as the dissent, in effect, insists, that even if the social workers are right, the judges have the muscles. The question, then, is should they use them on behalf of estimable people who file an adoption proceeding, or for the welfare of the child or children whose adoption is sought.

I am concerned with whether an approved child-placement agency, which has spent time and money in preparing a plan for a child or children placed with it for adoption, is

to be put on the defensive every time parties who desire to adopt the child or children win a race to the court house and start adoption proceedings.

(The Pellands never intimated to the Washington Children's Home Society that they would like to be considered as adoptive parents; they waited until the society tried to arrange for Janette to be seen by the couple the society had considered to be desirable adoptive parents for Janette and her twin sister, and then commenced an adoption proceeding limited to Janette only—later amended to include her twin sister.)

In my opinion, the basic thesis of the majority opinion is that, in such a situation, where the approved child-placement agency selected by the court refuses to consent to the adoption, and urges that it has developed its own plan for the future of the children, the burden should be upon the petitioners to show that the ultimate welfare of the children will be furthered by abandoning the plan developed by the court-appointed agency and in permitting the adoption by the petitioners. If that burden is sustained, the trial court is warranted in dispensing with the consent of the agency to the adoption.

Here, the trial court apparently proceeded upon the theory that immediately upon the Pellands having won the race to file an adoption proceeding, the only issue was whether the Pellands were fit and proper adoptive parents and able to support and care for the children. The burden was placed on the Washington Children's Home Society to prove to the contrary. Any plan they had for the children was regarded as more or less irrelevant.

The trial court found the Pellands to be fit and proper adoptive parents, and able to support and care for the children; and, on those findings, entered its decree of adoption. There is no finding one way or the other as to the desirability of the society's plan.

The majority insists, and I think correctly—and this, incidentally, is the heart of this emotionally surcharged controversy—that the trial court may only dispense with its

own agency's consent to an adoption, if it finds that it is in the best interest of the child or children concerned to do so.

I recognize that had it applied this test, the trial court might have arrived at the same result; and that it may do so on a rehearing, where the emotional appeal on behalf of the Pellands will be re-enforced by the lapse of time, and the fact that the Washington Children's Home Society may now have no plan available for the children because of the uncertainties inherent in the situation. Nevertheless to abandon the test of the welfare of the child or children in favor of the qualifications of the fleet of foot, is to bring chaos into the field of child placement and adoption.

WEAVER, C. J., and FOSTER, J., concur with HILL, J.

OTT, J. (dissenting)—I dissent for the following reasons:

(1) Appellant assigns error to that portion of the trial court's finding of fact No. 3 (relating to the fitness of the respondents) which states "that said petitioners are fully able and qualified to support and care for said children," and also to the following portion of finding of fact No. 4: "that petitioners, Howard Pelland and Edythe Pelland are proper persons for the adoption of said minor children."

In an adoption proceeding, the determination of the parental fitness of adoptive parents is a factual one. Each of the respondents was a witness. Their testimony established, *inter alia,* that they had had Janette in their home for nearly fifteen months; that she was a three-weeks-old sick baby when she arrived at their home and they had nursed her from sickness to health; that they had learned to love her as their own; that their three children shared their love for Janette; that for five years their home had been a qualified foster home in Pierce county; that they had ample home facilities for the twins; that they were both in good health and had sufficient means to raise and support the Reinius twins, and that they were willing that the twins should become their legal heirs and have their names changed accordingly.

The report of the court-appointed next-of-friend estab-

lished the good character and reputation of the respondents, and otherwise corroborated their testimony.

Appellant's witnesses had not investigated the home of the respondents in connection with their petition for adoption. Appellant offered no testimony to refute the report of the court-appointed next-of-friend relative to the good reputation which the respondents have in the community in which they reside for clean, wholesome, upright home life, or discredit their character of morality and virtue.

The appellant bases its objections to the court's findings upon the evidence that respondents were forty-three and forty-four years of age respectively; that they had been married twenty-five years and had grown children; that the adoptive mother had bursitis; that there was a conflict in the religious belief of the mother of the children with that of the adoptive parents, and that, therefore, the respondents are unfit adoptive parents for the infants, Janette and Nanette Reinius.

The trial court, in its memorandum opinion, considered and rejected each of appellant's objections for the following reasons:

"Now, first as to the matter of religion. Without going into the field of theology I am doubtful if the three-week-old child as a matter of law could be deemed to have a religion. Certainly when the natural mother relinquishes her own children to the state and to an agency she does not consider religion of sufficient importance as to have any bearing on the ultimate adoption of the children. I think most religions have some age of confirmation at which the subject voluntarily expresses his or her intent to become a member thereof. So I would rule that it is immaterial, where people of good moral character and of circumstances enabling them to act as proper parents, who may be of the Catholic faith, seek to adopt a child of the Protestant faith, of the Jewish faith, or whatever other faith the child may be, and the same ruling would apply where people of the Protestant faith seek to adopt children of the Catholic or Jewish faith, where the child is of that age, and all other factors being equal, that the religious background would be immaterial.

"Secondly, as to the age of the petitioners. The petitioning husband here is 44 years of age. He is young in appearance;

athletic looking; appears to be a man of full physical vigor. His wife appears to be in good health. She has suffered apparently from a minor ailment such as bursitis, but as of the time of this hearing her health is good. The petitioners are much in the same position as any family which has a widespread age group from the standpoint of having children of this age. There are many families where the youngest child is born to the family during the mid-forties of the parents. . . .

"As to the income the case for the petitioners is very strong. The history of 16 years continuous employment, and the rearing of a family, while it points perhaps to a greater age on the part of the petitioners nevertheless shows that this is a stable marriage, that it supplies evidence which can never be supplied with younger couples. Here is a stable marriage that has existed for all these years through the normal vicissitudes of family life, and nothing in the reports or in the evidence would indicate that the petitioners are other than the finest type of people or that they would do anything but give these children the finest type of environment."

We are committed to the following rules: We will not disturb a trial court's factual determination, if there is substantial evidence to support the finding. *Berger Engineering Co. v. Hopkins*, 54 Wn. (2d) 300, 308, 340 P. (2d) 777 (1959), and cases cited; *Drake v. Smith*, 54 Wn. (2d) 57, 60, 337 P. (2d) 1059 (1959), and case cited; *Wise v. Farden*, 53 Wn. (2d) 162, 166, 332 P. (2d) 454 (1958), and cases cited; *Williams Tilt-up Contractors v. Schmid*, 52 Wn. (2d) 429, 430, 326 P. (2d) 41 (1958), and case cited. We will not try factual matters *de novo. Abel v. Abel*, 47 Wn. (2d) 816, 819, 289 P. (2d) 724 (1955). We will not substitute our judgment in factual disputes for that of the trial court. *Wenzler & Ward Plumbing & Heating Co. v. Sellen*, 53 Wn. (2d) 96, 101, 330 P. (2d) 1068 (1958), and case cited. See *Henson v. Henson*, 47 Wn. (2d) 866, 878, 289 P. (2d) 1034 (1955); *Abel v. Abel, supra,* p. 819.

Applying these rules to the instant case, the record abundantly sustains the trial court's findings of fitness and its opinion that

"Whereas here the petitioners have had the one child in their custody and under their care, where they have

learned to love this child, and urge that they will have the same love for her twin sister . . . I am satisfied that the two infant children can enter this home and receive all of the love and the attention and the care to which they would be entitled from their natural parents."

(2) The majority hold that the trial court was arbitrary and abused its discretion when, during the hearing on this case, it denied, as immaterial, the appellant's offer of proof of the standards it used *generally* in the selection of placement homes, and limited its proof to the standards it *actually used* in selecting the "M" family home.

The appellant was permitted to prove that it had been in eleemosynary work since 1869; that it had qualified as an approved agency under the adoption statutes (RCW 26.32), and that it processes approximately three hundred adoptions annually. The evidence disclosed that, with reference to Janette and Nanette Reinius, the appellant's specially qualified field representatives interviewed various prospective adoptive parents and visited their homes. Sometime prior to the date of the hearing, the field representatives determined that, of the various homes visited, the "M" family were best qualified and, in their opinion, met the appellant's standards as adoptive parents. Although the "M's" had never seen the twins and had not petitioned for their adoption, the field representatives testified fully as to the standards they had used in selecting the "M's" as prospective adoptive parents, and why they beileved them to be more suitable than respondents. Appellant's field representatives did not interview respondents as prospective adoptive parents.

Under the facts of this case, the court was not concerned with the *general* standards used by appellant in selecting placement homes. The court was concerned only with the standards employed by appellant in its selection of the "M" family, and, with reference to those standards, appellant's witnesses testified fully. The court considered appellant's offer of proof and ruled thereon as follows:

"It [appellant] has a splendid record of activity on behalf of children in this state, but yet the grounds urged in the

case at bar I think are insufficient to warrant the requirement of their consent to this adoption."

The proffered evidence was immaterial and was properly refused.

Assuming, *arguendo*, that the court erred in excluding the evidence, the error was harmless and does not merit a reversal, where, as here, the evidence on the merits preponderates in sustaining the adoption decree. See *Hearron v. John Severyns & Co.,* 159 Wash. 486, 489, 293 Pac. 458 (1930). The primary concern of the court in an adoption proceeding is the welfare of the child. *State ex rel. Van Cleave v. Frater,* 21 Wn. (2d) 231, 236, 150 P. (2d) 391 (1944). See, also, *Henson v. Henson, supra,* p. 871. The exclusion of the offered evidence relative to the general standards appellant used in its selection of placement homes was not prejudicial to appellant and had no decisive or crucial bearing upon the court's primary concern—the welfare of the child.

(3) The majority opinion, in reversing the judgment, requires the use of standards which limit the trial court in the exercise of its discretion, in that, on the retrial, the trial court will be governed by the standards adopted by the Child Welfare League of America, Inc., of New York City.

With this requirement, I do not agree for two reasons:

(a) Adoption proceedings are statutory. The legislature has given to the trial court the unlimited right to exercise its discretion, both in the granting of an adoption petition and in waiving the consent of an approved agency. If, in the exercise of its discretion, the court is to be limited by certain standards, it is the province of the legislature to prescribe the standards by which the court is to be guided. Amendment 7, state constitution; *Senior Citizens League v. Department of Social Security,* 38 Wn. (2d) 142, 152, 228 P. (2d) 478 (1951). Our function, as an appellate court, is limited to a review of the trial court's exercise of its discretionary powers and to ascertaining, from the record, whether the exercise of that discretion has been abused. *Wenzler & Ward Plumbing & Heating Co. v. Sellen, supra; Abel v. Abel, supra,* p. 819.

(b) We cannot reverse the trial court for failing to follow the placement standards of the Child Welfare League of America, of New York, when those standards were never presented to it for consideration. These standards were mentioned for the first time in the argument at the *en banc* hearing, and, by leave of this court, were permitted to be filed with this court for its consideration. If these New York placement standards were worthy of consideration in this adoption proceeding, the appellant should have offered them in evidence at the trial court level. This the appellant failed to do.

In *Casco Co. v. Public Utility Dist. No. 1 of Thurston County*, 37 Wn. (2d) 777, 784, 226 P. (2d) 235 (1951), we said:

" . . . This court is a reviewing court, and, on appeal, considers only such evidence as was admitted in the trial court. On appeal of the case to this court, it would be very unfair to the trial judge to consider evidence in this court which was not before him when he entered his decision in the case. . . ."

(4) The majority do not agree with the trial court's conclusion that in adoption matters the law gives sole and exclusive power, not to approved agencies (public or private), but to the courts.

The trial court's conclusion that courts, and not the agencies, have exclusive power to grant or deny adoption petitions was correct. Upon petition of the chief probation officer for Pierce county, Janette and Nanette Reinius, on September 10, 1957, were found, by the superior court for Pierce county, "to be dependent children, made a permanent ward of the Pierce County Juvenile Court for the purpose of adoption."

The powers and duties of a qualified placement agency in adoption matters, in so far as they relate to *children who become wards of the court*, are defined by statute. Such qualified agencies do not have the power to grant adoption petitions. Their authority as to custody and care begins and ends at the discretion of the superior court. RCW 26.37.010 provides, in part, that " . . . The custody or

control of any such child by any such . . . society . . . may be inquired into, and, *in the discretion of the court, terminated* at any time . . . " (Italics mine.)

A qualified agency does not even have the authority to accept a relinquished child for placement without court approval. Any attempt by an agency to accept relinquishment direct from a parent "shall be void." RCW 26.36.010. The law *does* give to the agency, after the court appoints it as its placement agent, the right to consent to the granting of an adoption petition. RCW 26.37.010, *supra*; RCW 26.32.030.

RCW 26.32.020 provides, in part, that

" . . . any husband and wife, jointly . . . may petition the superior court of the county in which the petitioner is a resident or of the county in which the person to be adopted is domiciled, for leave to adopt, and to change the name, if desired, of any person."

The statute does *not* limit prospective adoptive parents to *only those who have the approval of a qualified agency*. The statute grants to any husband and wife who reside in the jurisdiction the unqualified right to petition for the adoption of any child that is a subject of adoption. The law further provides " . . . That if the approved agency refuses to consent to the adoption, the court, in its discretion, may order that such consent be dispensed with." RCW 26.32.030, *supra*.

The statutes are clear that it was the intention of the legislature, in the enactment of our adoption laws, that, when a dispute arises between an agency and prospective adoptive parents as to the qualifications and fitness of the latter, the *court*, and not the *agency*, has the sole and exclusive power to resolve that issue.

(5) The majority hold that, because the respondents had previously been foster parents, the trial court was arbitrary when it ordered the agency's consent dispensed with and granted respondents' petition for adoption. RCW 74.14.120 defines "foster home," and RCW 74.14.130 authorizes the state department of public assistance to certify certain homes as foster homes and to revoke a foster home license

if its rules are violated. There is nothing in the act which forbids the operators of foster homes to petition the court to become adoptive parents. RCW 26.32.020, *supra,* authorizes the respondents to petition for adoption of the Reinius twins. There is nothing in the law that in any manner disqualifies them as adoptive parents because of their operation of a foster home.

If, as found by the majority, there was some oral understanding between the parties or administrative rule that foster parents cannot become adoptive parents, the breach of the oral agreement or violation of the rule does not disqualify such person from petitioning for adoption under the law.

Assuming, *arguendo,* that such an understanding would legally disqualify respondents as petitioners in an adoption proceeding, the record in the instant case does not support the majority's conclusion that such an agreement *was* orally entered into between the *appellant* and *respondents.* Janette was not placed in the Pelland home by the *appellant.* The Pierce county branch of the state department of public assistance arranged for Janette's foster home care with the respondent Pellands. If it can be said that some agreement or rule was violated, it was an agreement with or a rule of the department of public assistance, acting through its Pierce county branch office. The department is not complaining, and is not a party to this proceeding.

Although the appellant, without the knowledge of respondents, had been given authority, by an *ex parte* court order dated September 10, 1957, to arrange for the placement of the Reinius twins, it made no arrangement whatsoever with the Pellands for the foster home care of Janette. Appellant did not even contact the Pellands until October 11, 1957, and then only to inform them that it had been advised of their adoption petition and would actively resist their adoption of the twins, and would refuse to consent thereto.

*There is no proof in the record before us of an oral agreement with appellant by which respondents agreed not to*

*petition to adopt the twins.* In fact, it was not known at the time the foster home care was arranged for by the Pierce county welfare officer that the mother would relinquish the twins for adoption, or that, if and when she did, the court would select the appellant as its placement agent. Respondents' petition to adopt was filed October 7th. The appellant's first contact with the respondents was on October *11th*, and, hence, no rule of appellant's could have been violated.

Had such an agreement actually been made and breached, or a rule violated, by the respondents, what was the orally agreed or implied penalty? Under the statute by which foster homes are established, the only legal penalty, if the *department of public assistance* elected to inflict it, would be a revocation of respondents' foster home license. In view of the statute which grants to the respondents the right to petition to adopt the twins, the only possible penalty that the *appellant* could inflict upon the respondents would be its right to have its day in court, to refuse its consent to the adoption, and openly to resist the granting of the petition. This penalty the appellant elected to inflict.

If the alleged agreement or rule was violated, such fact, if it is a fact, does not affect the fitness of *foster parents* to be *adoptive parents.* In the 1958 Annual Report of the appellant society, published in March, 1959, it had this comment in praise of foster parents:

" . . . no amount of money could possibly pay for the loving and understanding nurture which must be unselfishly given 24 hours a day. The reward for caring for a child must be measured in terms of the fun and satisfaction of watching him grow not only in body, but in his capacity for happiness and usefulness. . . . Theirs is indeed a real service."

Further, according to the standards adopted by the Child Welfare League of America (by which standards the majority require the court to be governed on a retrial), p. 38: "A home originally approved as a boarding [foster] home may be considered as an adoptive home if it meets the needs

of a particular child." Respondents' home admittedly meets the "needs of a particular child."

The court did not abuse its discretion in refusing to deny the adoption petition of the Pellands simply because they were formerly foster parents.

(6) The majority hold that the trial court, in ordering appellant's consent dispensed with, acted arbitrarily because the law grants to the agency "sole and exclusive power" to refuse consent, the agency being, in effect, "the custodial guardian" of the children or *in loco parentis*. I do not agree.

RCW 26.37.060 provides: "Nothing in this chapter shall entitle any such *society* to act as guardian . . . of any minor child." (Italics mine.) That it was the intent of the legislature that the society *not* act as guardian of the person of such minors could not be more clearly expressed.

Does the act give the appellant a status of *in loco parentis*? There is nothing in the statute that gives approved agencies any right or authority other than that which the words indicate. Where, as in this case, the infants are adjudicated to be *wards of the court,* the agency it authorizes to find placement is a *servant of the court, not its master. State ex rel. Van Cleave v. Frater, supra,* p. 236. The law places in the court the authority to grant an adoption petition. The status of *in loco parentis,* if it can be said to exist, is in the court.

The court does not have the administrative personnel to provide care and housing for its wards during the interim period awaiting placement; nor does it have the personnel to investigate and find families who are fit prospective adoptive parents. The statute, therefore, authorizes the court to appoint qualified agencies to carry on these duties *for the court.* The law has clothed the agency with authority to find and recommend to the court persons it has found to be proper prospective adoptive parents. However, the statute is plain and unambiguous that the "principal" (the court), after hearing the objections of its "agent" (the society) to an adoption and its recommendations relative thereto, is

not duty bound to follow its agent's recommendations, but may order the agent's consent dispensed with. Since the law gives to the court the right to order adoption, it is the court, and not the agency, which stands in the status of parents, if any such status was intended to be established by the act.

(7) What does the majority intend to accomplish by the retrial?

(a) Is the trial court to reopen the case simply for the purpose of permitting the appellant to introduce into evidence for the court's guidance the standards adopted by the Child Welfare League of America, Inc., of New York? These standards differ from those used by the appellant in selecting the "M" family, therefore the "M" family is not qualified, and, if the Pellands likewise do not qualify, is the court directed to dismiss the Pellands' petition for adoption, as well as that of the "M's", should the latter elect in fact to petition the court for adoption of the twins? Justice and reason require that the posed question be answered in the negative.

(b) In appellant's argument on appeal, this court was advised that the "M" family have accepted another placement and are not now interested in adopting the Reinius twins.

Upon the retrial, are the Pelland's qualifications as adoptive parents for the twins to be matched against those of any other family the appellant is able to produce? This will, of necessity, be the practical result, since the issue of fitness as adoptive parents between the Pellands and the "M" family is now moot.

(c) Is it the intent of the majority that this case should be sent back for retrial simply to give the appellant an opportunity to make a *better record* relative to the real issue that it wants decided, namely, the power of the trial court to waive consent of an agency in an adoption proceeding? If so, why should these unfortunate children be used as pawns, and their welfare and happiness jeopardized, in the appellant's attempt to determine the limits of its authority, when that issue could be properly litigated in a declaratory judgment action without involving helpless children.

I am confident that, after the trial judge is *compelled* to consider the additional standards (which were not used by the appellant in its selection of the "M" family), he will again award the twins to the Pellands. The result of a retrial, in my opinion, will accomplish nothing but further delay, further heartaches, and further injustice.

(8) The majority opinion is concerned with the alleged lack of proper standards used by the trial judge in granting the Pellands' petition to adopt the Reinius twins. In the standards testified to by the witnesses for the appellant, and in the suggested standards of the New York corporation, the most important of all standards, namely, *parental love of the adoptive parents for the child or children to be adopted,* is not mentioned at all. The words "morality" and "wholesome, clean living" on the part of the prospective adoptive parents were standards which *appellant's witnesses* did not even mention to the trial judge. Likewise, the respondents' proven ability to raise children to be morally clean, upright citizens was not a standard of any concern to the appellant.

Against the standards of appellant, the court weighed the standards of moral fitness, wholesome, clean living, ability to raise children, proven ability to care for these twins in particular, and the *genuine love for the twins* of the Pellands. They had for two months nursed Janette from sickness to health. They had a birthday party for the twins on the occasion of their first birthday. At the time of the hearing, the Pellands had had Janette for more than fifteen months (now for nearly three years), and, in open court, expressed genuine love for her.

Although the statute grants the appellant the right to consent or object to an adoption petition, appellant made no inquiry as to the moral and social fitness of respondents, or as to the adequacy and cleanliness of their home.

The standards used by the trial judge are, in my opinion, paramount in determining parental fitness.

The writer of the concurring opinion offers the following additional suggestions for reversing the trial court:

(a) The Pellands did not request the appellant society to consent to their petition for the adoption of the twins.

RCW 26.32.020, *supra,* does not require that consent of the agency be obtained or refused as a condition precedent to filing a petition for adoption. Furthermore, in this case, the society intervened and was given its day in court on its objections to the petition and its reason for refusing to consent. Where, as here, the society has a child for placement and a petition for adoption is filed, *the society owes a duty to the court to investigate the petitioners and their home before determining* whether its consent will be granted or denied. In the instant case, the appellant society declined to consent, without making any investigation of the respondents or their home. Since the law places no duty upon the petitioners in an adoption proceeding to seek or obtain the society's consent to their petition, if there was any breach of duty in this case it was on the part of the appellant society, when it refused to consent to the adoption without ever investigating the respondents as adoptive parents.

(b) The writer of the concurring opinion voices concern that the society will be "put on the defensive every time parties who desire to adopt the child or children win a race to the court house and start adoption proceedings," and suggests that the trial court decided this case "in favor of the qualifications of the fleet of foot."

Although I do not think it seemly or proper to compare the serious matter of an adoption proceeding, which deals with the destiny of human beings, to an athletic contest, if it can be said that there was a race, the society's entry was on the starting line at the time the gun was fired. Its contestant had had no experience in raising a child, yet this entry represented the society's plan for the future life of the twins. The judge, standing at the finish line, selected as the winners the entries who were experienced in raising children and who had proved their ability to care for and love the twins.

The society was *not* put on the *defensive* during the trial of this case. It was afforded every opportunity to establish

affirmatively why it believed the "M" family to be fully qualified, and the respondents to be "unfit." The judge found, from the evidence as he weighed it, that the welfare of the twins would best be served by granting the respondents' petition.

(c) The writer of the concurring opinion states:

(1) "The trial court found the Pellands to be fit and proper adoptive parents, and able to support and care for the children; and, on those findings, entered its decree of adoption. There is no finding one way or the other as to the desirability of the society's plan."

In making this statement, the writer of the concurring opinion failed to include the crucial part of the court's decree concerning the welfare of these children, which states:

" . . . and the court further finding that the petitioners are fit and proper persons to adopt said children and that said petitioners are fully qualified to adopt said children *and that said adoption is for the best interests of each of them,* . . ." (Italics mine.)

Nor is that portion of the statement that "There is no finding one way or the other as to the desirability of the society's plan" supported by the record before us. On p. 53 of the statement of facts is the court's oral decision, in which the court rejected "the desirability of the society's plan" as it applied to the facts and circumstances of this case, as follows:

" . . . I think that the Washington Children's Home Society has acted in accordance, of course, with its true concept, that it always has the interest of the child at heart. It has a splendid record of activity on behalf of children in this state, *but yet the grounds urged in the case at bar I think are insufficient to warrant the requirement of their consent to this adoption.*" (Italics mine.)

This is not a proceeding to test the sufficiency of the *plan* used by the appellant society in selecting prospective adoptive parents. If such a *test* is desired, there are legal procedural methods by which it can be accomplished, without involving the welfare of specific children. The *material issue* in this case is the welfare of the children. We have frequently announced the rule that the trial court is not re-

quired to include evidentiary facts in its findings, but need only find the ultimate facts upon the material issues. *Wentz v. T. E. Connolly, Inc.,* 45 Wn. (2d) 127, 132, 273 P. (2d) 485 (1954), and cases cited. Upon this issue, the court found "that said adoption is for the best interests of each of them."

(2) ". . . the basic thesis of the majority opinion is that, in such a situation, where the approved child-placement agency selected by the court refuses to consent to the adoption, and urges that it has developed its own plan for the future of the children, the burden should be upon the petitioners to show that the ultimate welfare of the children will be furthered by abandoning the plan developed by the court-appointed agency and in permitting the adoption by the petitioners. If that burden is sustained, the trial court is warranted in dispensing with the consent of the agency to the adoption."

Assuming, *arguendo,* that refusal to consent places upon the *petitioners* the suggested *additional burden of proof,* that burden was squarely met in the instant case. Here the court weighed the facts that Janette had been in the home of the respondent petitioners for more than fifteen months; that it was an early placement direct from the hospital, and that petitioners had raised a family of their own and knew what responsibility must be assumed and sacrifice made by accepting in their home two infants of tender years, against the qualifications of the "M" family who lacked experience and proved ability to raise children. The trial court then exercised its judicial discretion and granted respondents' petition for adoption.

We have defined judicial discretion as follows:

". . . a sound judgment which is not exercised arbitrarily, but with regard to what is right and equitable under the circumstances and the law, and which is directed by the reasoning conscience of the judge to a just result." *State ex rel. Clark v. Hogan,* 49 Wn. (2d) 457, 462, 303 P. (2d) 290 (1956).

Further, we have said:

". . . To justify interference by a reviewing court, in cases where it is alleged that a trial court abused its judicial discretion, proof that the discretion exercised was clearly

untenable or manifestly unreasonable is required. [Citing case.] Abuse of judicial discretion is, therefore, never presumed." *Abel v. Abel,* 47 Wn. (2d) 816, 819, 289 P. (2d) 724 (1955).

(d) The writer of the concurring opinion concludes that "to abandon the test of the welfare of the child or children . . . is to bring chaos into the field of child placement and adoption."

The statement implies that the trial court, in the instant case, abandoned the "welfare of the child" test, when, in fact, the record discloses that it was the *only test* the trial court applied. Under the facts of this case, chaos would be created only by arbitrarily substituting the judgment of this court for that of the trial court. That chaos would result from a reversal was admitted by appellant's own counsel during oral argument at the *en banc* hearing. The attorney for appellant society, in answer to a query by one of the judges of this court as to the possible result of a retrial, said:

"That is one of the real unfortunate things. With 'M' family out of the picture, if the decision of the trial court should be reversed, this matter would go back and then the Children's Home Society would start to search for a new home and, in the meantime, the child has been in this home with these people [respondents] since, I think it was, October of 1956, and *I don't believe it is going to do that youngster any good to throw this thing back into a vacuum and do it all over again.*" (Italics mine.)

It would do more than that—it would be a real tragedy in the life of Janette, if the love that she has received from the respondents since she was three weeks old were to be permanently severed by a court order awarding her to strangers. Further, the previously unblemished, upright character of the respondents will be unjustly maligned by adjudicating them "unfit" to be parents, and the sorrow of the Pellands will be tantamount to that of natural parents who lose a beloved child in death. Such a result is not a just reward for the five years of "real service" furnished by the Pellands that "no amount of money could possibly pay for."

Finally, the twins should be loved, cherished, and raised

together. Before the hearing, the appellant kept them in separate homes and they are still separated. Since the appeal to this court, they have been kept apart by an injunction granted at the request of the appellant. The Pellands love both of them. The trial court agreed that the twins should be loved and raised together in the same home, and so ordered.

For the reasons stated, the judgment of the trial court should be affirmed.

MALLERY and DONWORTH, JJ., concur with OTT, J.

[1] Reported in 346 P. (2d) 692.