[No. 33815-3-I.    Division One.    April 11, 1994.]

*In the Matter of the Dependency of* G.C.B.

MEGAN LUCAS, ET AL, *Respondents*, v. THE
DEPARTMENT OF SOCIAL AND HEALTH SERVICES,
*Petitioner.*

Christine O. Gregoire, Attorney General, and Dennis Adrian Kole, Assistant, for petitioner.

Richard C. Kimberly and Law Offices of Richard C. Kimberly, for respondents.

PEKELIS, A.C.J. — The State of Washington Department of Social and Health Services (DSHS or Department) appeals the trial court's order requiring a minor in its care to be placed with Megan and Wade Lucas for a postplacement adoption study. A commissioner of this court granted the Department's emergency motion for discretionary review and stayed the trial court's order pending review by this court. We reverse and dismiss the petition for adoption.

I

G.C.B. was born to Megan B. (now Megan Lucas) on May 6, 1990. In November of 1990, DSHS initiated a dependency proceeding concerning G.C.B. on the grounds that G.C.B. had been abandoned. The action was precipitated when Megan left the state, leaving G.C.B. in the care of her fiance, Wade Lucas, and her 16-year-old sister.[1] In support of the depen-

---

[1]The whereabouts of the alleged biological father were unknown at the time, and he has never been a party to any proceedings pertaining to G.C.B. His parental rights were terminated by order of the juvenile court on December 22, 1992.

dency petition, the State alleged that Megan had a history of mental instability, substance abuse, suicide attempts, and juvenile offenses. The allegations were uncontested, and on January 24, 1991, dependency was established by an agreed order signed by Megan and her attorney.

At the time, G.C.B. was in foster care; the dependency order provided that he should remain in licensed care under the supervision of DSHS. Following a series of dependency review hearings, G.C.B. was returned to Megan's home on June 18, 1992. In the interim, Megan had married Wade Lucas and, on April 8, 1992, given birth to a second child.

On July 13, 1992, Megan advised the Department that she wished to return G.C.B. to foster care. According to Megan, she had separated from Wade Lucas and she "had a baby that was two months old and the pressure of dealing with the split and the child was too much". G.C.B. was returned to foster care, and shortly thereafter Megan and Department caseworkers began to discuss relinquishment of parental rights.

The parties disagree about the events surrounding Megan's relinquishment decision.[2] It is undisputed, however, that on August 12, 1992, Megan signed a "Relinquishment of Custody [and] Consent to Termination/Adoption", which was witnessed by the attorney who had represented her throughout the dependency proceedings. The relinquishment and consent was approved by court order on September 8, 1992.

' In late August and early September, however, the Department began to receive telephone calls from Megan Lucas's grandmother, Margaret McSpadden, complaining about the relinquishment process. In response, the Department requested a hearing in order to make a full record establish-

---

[2]According to the Department, Megan Lucas told Department caseworkers that she wished to relinquish her parental rights and unequivocally reaffirmed her desire to do so on many occasions over the course of several months. According to Megan, she was summoned to a meeting with three caseworkers, who expressed concern about whether she could care for G.C.B. and pressured her to relinquish her parental rights. Megan asserts that she finally broke down and agreed to the relinquishment because she could not take the pressure, but that she did not understand that she "absolutely had no say and he could be adopted by anyone".

ing that the relinquishment was voluntary. At the September 17 hearing, Megan testified about her decision to relinquish as follows:

I just believe that [G.C.B.] is a hyperactive child and I have a small daughter and he was too much for me to care for . . . being a single parent and I really believe that he could be better cared for by a two parent family and someone who has more financial means than I do and I just really think that would be best for him.

In response to questions by the court, Megan acknowledged that she had signed the relinquishment papers, that no threats or promises had been made to her regarding the relinquishment, that she had told the DSHS caseworkers she wanted to relinquish, and that her decision was made freely and voluntarily after consultation with her attorney.

Following this hearing, the juvenile court entered an "Order Terminating Parent-Child Relationship" on December 22, 1992. DSHS was granted permanent legal custody of G.C.B.

with the right to place the child in a prospective adoptive home; the power to consent to the adoption of the child; the power to place the child in temporary care; . . . and the authority to consent to such other matters as might normally be required of the parents of the child pending the finalization of the child's adoption[].

During the course of the dependency and following the termination of parental rights, G.C.B. was placed in several foster homes that had potential for adoptive placement, but which did not work out.[3] In September 1993, the Department planned to place G.C.B. in foster care with a same sex couple considered by the Department to be a prospective adoptive home. G.C.B. was scheduled to be placed in the new foster home on September 9, 1993.

On the morning of September 9, seeking to "block the transfer", Megan Lucas filed a Petition to Revoke Consent

---

[3]In accordance with RCW 13.34.210, preadoption review hearings were held on April 19 and October 20, 1993. Ensuing preadoption review hearing orders provided that G.C.B. would remain in the permanent custody of DSHS, which retained "the authority to consent to the child's adoption", and that DSHS would continue to provide preadoption services and case planning for the child.

in juvenile court in order to undo the termination of her parental rights. The petition alleged that when her consent to relinquishment was obtained, Lucas "was not mentally competent to fully understand and execute the same as her free and voluntary act", and that her agreement had been "obtained through duress and fraud on the part of the [DSHS]". In her accompanying declaration, Megan Lucas averred that following her relinquishment, her "worst nightmare" came true when she learned that "a homosexual couple out of Seattle . . . seeks to adopt the child . . .". The court granted Lucas's ex parte motion for a temporary restraining order preventing "transfer of the minor child to a prospective adoptive parent".

Following a show cause hearing on September 20, 1993, a court commissioner found that there was "not a significant likelihood of Ms. Lucas prevailing on the merits of her petition", and that there was "no well grounded fear of immediate invasion of her rights". Hence, on September 23, the commissioner denied Lucas's request for a preliminary injunction against the transfer, denied Lucas's motion for an order reinstating the original ex parte restraining order, and reaffirmed that "[t]he Department is the legal custodian of the child and has sole and discretionary authority to place the child in any licensed foster home". G.C.B. was transferred to the new foster placement on September 21, 1993.

On October 7, the juvenile court heard a motion for revision of the order denying Lucas's request for a preliminary injunction. The court determined that Lucas had no standing to challenge G.C.B.'s placement, finding that "[t]he Department is the valid custodian of the child and has the legal authority and right to place the child in any licensed foster home on a temporary basis." Hence, on October 26, the court found an insufficient basis to issue an injunction against G.C.B.'s temporary placement in a foster home. However, the court found that Lucas did have standing "to prevent an adoption of her child until such time as there is

a trial on the merits on her underlying Petition to Revoke Consent".

On November 1, 1993, while the petition to revoke consent was pending, Megan and Wade Lucas jointly filed a petition for adoption in superior court. A "Pre-Placement Adoption Study" prepared by Ann McGee Moody, adoption specialist, was also filed. The report concluded that "Megan and Wade Lucas are able to provide adequately for this child's needs and it is recommended that their petition to adopt Megan's birth son, [G.C.B.], be granted."

The Lucases also noted a motion for an order that G.C.B. be placed in their care as prospective adoptive parents for the purpose of obtaining a postplacement report as required by RCW 26.33.200. The Department opposed the motion, arguing that it did not consent to G.C.B.'s placement with or adoption by the Petitioners and that placement with them would not be in the best interests of G.C.B.[4]

Because it did not consent, the Department contended that under RCW 26.33.170 "a full fact finding hearing" was required, and that the court was authorized to dispense with the Department's consent only if it determined by clear, cogent and convincing evidence that the proposed adoption is in the best interests of the child. The Department further argued that because Megan Lucas had already invoked the jurisdiction of the juvenile court by filing the petition to revoke her consent to the termination of her parental rights, the Superior Court should stay the adoption proceedings until the juvenile court proceedings were concluded.

---

[4]The Department submitted supporting affidavits from a DSHS caseworker and G.C.B.'s guardian ad litem, both of whom recommended against placement of G.C.B. with Megan and Wade Lucas for a number of reasons: "Ms. Lucas's past history and inability to provide care to [G.C.B.], and her own statements that she is not bonded to him"; G.C.B. has "special needs" requiring "exceptional parenting skills"; G.C.B. was doing well and in a stable relationship with foster parents who have exceptional parenting skills and plan to adopt him; it is in G.C.B.'s best interest to have as little disruption in his placement as possible; in preparing her preplacement report, Ann McGee Moody had "not been provided with accurate information by Ms. Lucas in many important respects".

Following oral argument heard on November 12, the court ordered G.C.B. placed with the Lucases, finding "no reason why the adoption action should be stayed". In its oral opinion, the court reasoned as follows:

> Contrary to the argument presented by the agency . . ., this court reads the adoption statutes in such a manner that they are mandatory on the court. . . . [U]nder the law any person has a right to petition to adopt . . ..
>
> The statute makes it clear that when a pre-placement report is filed with a petition to adopt, it isn't discretionary language, the statute makes it clear it's mandatory language on the court that the court shall order a post-placement report. This court doesn't see any way that a post-placement report can be prepared unless there's placement. Once the court has the benefit of a pre- and post-placement report, it's then in a position to determine whether there's clear, cogent, and convincing evidence that the child's best interests is in going through the adoption or not going through with the adoption.

The court was then advised that G.C.B.'s current foster care providers intended to adopt, but had not yet filed a petition because they were awaiting the outcome of Megan Lucas's petition to revoke her consent to termination of her parental rights. Anticipating competing adoption petitions, the court sought to minimize the "turmoil and trauma to this child by being floated around from home to home", and found it in G.C.B.'s best interest to remain in foster care for 30 days so that the foster parents would have an opportunity to obtain a postplacement report. The court then ordered that on December 12, 1993, G.C.B. "be placed in the care and custody of the [Lucases] for purposes of preparation of a post-placement report".

At this point, Megan Lucas brought a motion to dismiss her petition to revoke consent, which the court granted. In the motion, Lucas acknowledged that if she successfully vacated the order terminating her parental rights, then the State would seek to terminate her parental rights involuntarily. Lucas explained that she preferred to pursue adoption, "knowing that should she be successful, the State can no longer control her or her children."

On December 3, 1993, a hearing was held regarding entry of the court's written order requiring placement of G.C.B. The Department again argued that an evidentiary hearing was necessary "to allow the Department an opportunity to present its concerns . . . regarding [the] placement [with Megan and Wade Lucas] before the court would order it."

The court reiterated its conclusion that it is "mandatory to do a post-placement report when the pre-placement is filed", but acknowledged that it could decline to order placement "[i]f the child's welfare is endangered by being put in the prospective adoptive home . . .".

Although the Department pointed to the affidavits indicating that G.C.B. had a need for stability and permanence and that it would be contrary to his best interests to change his placement, the court concluded that the Department had failed to demonstrate endangerment because it had made no inquiry into the "current condition in the [Lucas] home", but instead had relied on outdated information. According to the trial court, the evidence in the dependency file was "old news" insufficient to trigger a need for the evidentiary hearing sought by the Department.

A written order requiring placement with Megan and Wade Lucas for the purpose of preparation and filing of a postplacement report was entered on December 3, 1993. The court's detailed order includes the following findings:

1. Petitioners are "in law legal strangers to the minor child and . . . have the same rights as any other . . . persons under RCW 26.33.140 to petition to adopt the minor child";

2. "There is no reason in law or fact that she should not now be permitted to be considered, along with any other prospective adoptive parent who might petition to adopt the minor child, as a proper adoptive parent";

3. The preplacement report contains no indication that temporary placement with Megan and Wade Lucas would threaten G.C.B. with any harm or danger;

4. DSHS has presented no facts or circumstances to rebut or contest the preplacement report;

5. The fact that DSHS has orally stated that it would not consent has "no bearing upon the issue."

The Department filed an emergency motion for discretionary review in the court of appeals.[5] On December 10, a commissioner of this court granted discretionary review, ordered the trial court's December 3 order stayed pending appeal, and imposed an expedited schedule for perfection of this appeal.

## II

On appeal, DSHS essentially argues that, before ordering temporary placement, the trial court should have permitted a full evidentiary hearing on the ultimate issue of the best interest of the child. We agree that the legal touchstone in any adoption proceeding, expressed in the legislation itself, is the child's best interest. "The guiding principle must be determining what is in the best interest of the child." RCW 26.33.010; *see also, e.g., In re Adoption of Baby Girl K*, 26 Wn. App. 897, 905, 615 P.2d 1310 (1980), *review denied*, 95 Wn.2d 1003 (1981).

Nevertheless, we disagree with DSHS that the error of the trial court here was simply a failure to hold an evidentiary hearing. Rather, the threshold issue is whether, in light of the termination of Megan Lucas's parental rights, the adoption petition is legally cognizable. We hold that, owing to the termination, the petition was fatally flawed and should have been dismissed without any hearing on the merits of placement whatsoever.

It is undisputed that the parent and child relationship between Megan Lucas and G.C.B. has been, for all intents and purposes, finally terminated by a valid and subsisting order entered pursuant to RCW 13.34. Under the express language of RCW 13.34.200, termination of parental rights deprives a

---

[5]On December 6, after the motion for discretionary review was filed, the current foster parents filed (with the trial court) a cross petition for adoption of G.C.B., together with a preplacement report. The cross-petitioners are not parties to this appeal.

parent of standing to appear in all legal proceedings concerning his or her child.[6] Although neither party brought this statute to our attention, it is the duty of an appellate court to apply a dispositive statute to the undisputed facts of a case notwithstanding the parties' failure to call the statute to the attention of the court. *See Chmela v. Department of Motor Vehicles*, 88 Wn.2d 385, 393, 561 P.2d 1085 (1977); *Bitzan v. Parisi*, 88 Wn.2d 116, 126, 558 P.2d 775 (1977).

This statute directly affects the validity of the trial court's findings that Megan Lucas had "the same rights as any other . . . person[] . . . to petition to adopt the minor child", and that "there is no reason in law or fact that she should not now be permitted to be considered . . . as a proper adoptive parent". These findings, more accurately characterized as conclusions of law, are untenable because they wholly overlook the statutory effect of the order terminating Megan Lucas's parental rights.[7]

■ By depriving a terminated parent of standing in all future legal proceedings concerning the child, the Legislature recognized that entry of a valid termination order severing the relationship between the child and parent constitutes a final, unassailable determination that such permanent termination is in the best interest of the child.[8]

Accordingly, we hold that upon entry of a termination order pursuant to RCW 13.34.180-.190, a parent whose rights have been terminated may not relitigate that issue through a petition for adoption, or through any other legal proceeding.

---

[6]Upon the termination of parental rights pursuant to RCW 13.34.180, "all rights, powers, privileges, immunities, duties, and obligations, including any rights to custody, control, visitation, or support existing between the child and parent shall be severed and terminated *and the parent shall have no standing to appear at any further legal proceedings concerning the child . . ..*" (Italics ours.) RCW 13.34.200(1).

[7]The provisions of RCW 13.34.200 were expressly incorporated into the order terminating the parent-child relationship between Megan Lucas and G.C.B.

[8]In *In re Dependency of A.V.D.*, 62 Wn. App. 562, 815 P.2d 277 (1991), this court held that even where the trial court has found that visitation with the terminated biological parent would be in the best interest of the child, RCW 13.34.200 does not allow for it. 62 Wn. App. at 575 n.13 (citing *In re Welfare of Ferguson*, 41 Wn. App. 1, 8, 701 P.2d 513, *review denied*, 104 Wn.2d 1008 (1985)).

*See Baby Girl K*, at 905 (it would be contrary to policies behind relinquishment and adoption statutes to allow natural parent to intermeddle with child's affairs after relinquishment). Because the parental rights of Megan Lucas were terminated, she cannot maintain a petition to adopt G.C.B.

█ We recognize that Wade Lucas is one of the joint adoption petitioners, and that because he is not a terminated parent, he is not directly precluded from adopting G.C.B. by virtue of RCW 13.34.200. However, his petition is invalid for another reason. Under RCW 26.33.150(4), if the petitioner is married, "the petitioner's spouse shall join in the petition". Because Wade Lucas's spouse is unable to join in the petition, he is unable to comply with the statute. Hence, the adoption petition at issue in this case must be dismissed.

## III

The foregoing analysis suffices to decide this appeal. Yet because the trial court's ruling was so contrary to established principles in the law of adoption, and because DSHS in large measure acquiesced in the trial court's misperceptions, we feel compelled to comment further.

█ The Lucases maintain that the enactment of RCW 26.33.200, which provides for the preparation and filing of *post*placement reports, in effect created a right to obtain placement of an adoptee.[9] They argue that any individual who has procured a favorable preplacement report may not only commence a proceeding to adopt any potential adoptee, but also obtain placement of that child in order to have a postplacement report prepared. The Lucases believe this right exists regardless of the fact that the custodial agency responsible for adoptive planning had neither placed the child with them nor consented to the adoption. The trial court, on the other hand, ruled that the Department could prevent such placement, but only if it proved that the prospective placement would endanger the child. We believe that both of these

---

[9]This statute provides, in pertinent part, that "[a]t the time the petition for adoption is filed, the court shall order a post-placement report made to determine the nature and adequacy of the placement and to determine if the placement is in the best interest of the child." RCW 26.33.200(1).

readings of section .200 are incorrect and would unacceptably frustrate the legislative scheme of adoption.

■ An adoption proceeding is initiated when a "prospective adoptive parent" files a petition for adoption accompanied by a preplacement report. RCW 26.33.150(1), (5). The statute does not define "prospective adoptive parent", nor does it describe the qualifications necessary to become one. Although "[a]ny person who is legally competent and who is eighteen years of age or older may be an adoptive parent", RCW 26.33.140(2), it does not follow that every such person is a "prospective adoptive parent" with the right to commence adoption proceedings and obtain placement of a particular child. Rather, we surmise from both common sense and a long line of Supreme Court authority that it is ordinarily the prerogative of the Department or child-placing agency to designate prospective adoptive parents for a particular child.[10]

The argument that placement became automatic when the Legislature enacted the postplacement provision is indefensible. So too is the corollary argument endorsed by the trial court, *i.e*, that absent a danger to the child, a nonconsenting custodian ordinarily has standing only to oppose entry of a decree of adoption at a final adoption hearing scheduled according to RCW 26.33.240.[11]

Adoption is not a public forum open to any and every person who may wish to adopt. In cases where an agency has become the facilitator of a child's adoption, one cannot simply select a

---

[10]Child-placing agencies have equal status with the Department for purposes of custody and placement of dependent children. *In re Ramquist*, 52 Wn. App. 854, 859, 765 P.2d 30 (1988), *review denied*, 112 Wn.2d 1006 (1989). We will hereinafter refer to both as "custodial agencies".

[11]Throughout these proceedings, DSHS has argued only that the trial court misinterpreted this provision, *i.e.*, that once DSHS declined to consent, the burden shifted to the adoption petitioners to prove that the prospective adoption would be in the best interest of the child. It is true that the Department's "consent to adoption" may only be dispensed with "if the court determines by clear, cogent and convincing evidence that the proposed adoption is in the best interests of the adoptee." RCW 26.33.170. We believe, however, that the Department's right to withhold consent to a *final adoption* is an entirely separate question from the Department's authority over temporary placement in a prospective adoptive home.

720

particular child in custodial care, obtain a preplacement report, pay a filing fee, and become "the prospective adoptive parent" with automatic entitlement to temporary placement of that child.[12] Rather, as consistently recognized by the Supreme Court, the custodian plays an integral role in carrying out its legislatively mandated purpose of finding a proper adoptive home.[13]

In *In re Reinius*, 55 Wn.2d 117, 346 P.2d 672 (1959), the majority emphasized the fundamental role of custodial agencies in the adoption planning process, as well as the degree of authority conferred upon such custodians following termination of parental rights:

> [O]nce the court makes the determination that it is for the best interest and welfare of the child that such child be committed to the custody of the particular agency for adoptive purposes, then it would seem logically compelling that the agency should be given every reasonable opportunity, and in this respect *should be supported by the courts in its programming or actions designed to find proper adoptive parents and to place the child permanently with such parties for adoption.*

(Some italics omitted. Italics ours.) 55 Wn.2d at 127-28. The *Reinius* majority recognized the realities of agency adoption in no uncertain terms, observing that

> [i]t is time consuming and costly for an approved agency to investigate prospective adoptive parents and to work with them on a prospective plan of adoption. . . .[I]t is not conducive to orderly and effective operation of the foster home care program to permit [third parties] . . . to interrupt and to set aside for naught a plan of adoption made by an approved agency.

55 Wn.2d at 128 n.4.

Similarly, in *In re Adoption of Infant Boy John Doe*, 74 Wn.2d 396, 444 P.2d 800 (1968), the Supreme Court recog-

---

[12]*Cf. Mitchell v. John Doe*, 41 Wn. App. 846, 849, 706 P.2d 1100 (1985) ("It would be absurd to argue that anyone walking by a yard, taking a fancy to children seen playing there, has standing to petition for visitation with them.").

[13]A custodial agency is by statute clothed with authority to find a permanent adoptive home for a child committed to its care. *See* RCW 13.34.210 (Department given custody of child following termination of parental rights "for the purpose of placing the child for adoption"); RCW 26.33.090(5) ("An order of relinquishment to an agency or the department shall include an order authorizing the agency to place the child with a prospective adoptive parent.").

nized the plenary authority conferred upon the legal custodian over temporary placements. The court found nothing to

> prevent[] an approved child-placing agency from terminating such a tentative placement *whenever* it believes that the arrangement is not working out satisfactorily or that the welfare of the child requires it. It is not only the agency's right, as the guardian of the child, but its duty to remove the child which the court has placed in its care and custody from what it believes to be an unsuitable environment.

(Italics ours.) 74 Wn.2d at 402.

In the present case, the scope of the Department's authority was plainly stated in the numerous orders entered below pertaining to G.C.B. Having been made the legal custodian of the child with the express right to place the child in a prospective adoptive home and the right to terminate such placement, the Department has equal authority to *withhold* placement in the first instance. *Cf. Tuerk v. Department of Licensing*, 123 Wn.2d 120, 124-25, 864 P.2d 1382 (1994) (administrative agencies have those powers expressly granted to them and those necessarily implied from their statutory delegation of authority).

The Lucases attempt to distinguish *Reinius* and *Adoption of Doe* on the ground that those cases were decided before the section on postplacement was added to RCW 26.33. We are unpersuaded. Nothing in the subsequent legislation providing for the preparation of postplacement reports demonstrates any intent on the part of the Legislature to take placement decisions away from the custodial agency. Moreover, we would not adopt such an interpretation of the postplacement provision, for to do so would lead to absurd results. *See, e.g., Mitchell v. John Doe*, 41 Wn. App. 846, 849, 706 P.2d 1100 (1985) (a necessary part of determining the legislative objective is to construe a statute sensibly in order to avoid an absurd result).

The interpretation urged by the Lucases would turn the process of adoption on its head, mandating placement of the child with whoever files a petition instead of encouraging petitions by those with whom the child has been successfully placed. Several unacceptable results would flow from such a scheme, all contrary to the best interests of adoptees.

First, as feared by the *Reinius* majority, allowing placement without agency consent and after preadoptive planning steps have been taken would jeopardize existing placements for no other reason than some other person desires to adopt. In the context of child placement, courts must vigilantly promote stability, predictability, and continuity in established relationships. *See, e.g., In re J.B.S.*, 123 Wn.2d 1, 12-13, 863 P.2d 1344 (1993); *see also In re Adoption of Baby Girl K*, 26 Wn. App. 897, 905, 615 P.2d 1310 (1980) (recognizing strong public policy interest in achieving finality in the placement of children, promoting stability in family relationships, and protecting the integrity of the adoption process), *review denied*, 95 Wn.2d 1003 (1981).

Second, the interpretation would undermine the legitimate goal of adoption accomplished through careful and deliberate planning. Anxious prospective adoptive parents, fearful that during the period of temporary placement a rogue petitioner should win a "race to the court house", would be encouraged to rush into adoption instead of allowing a reasonable time to ensure that the child is suited to the home and the home is suited to the needs of the child. *See Reinius*, 55 Wn.2d at 130-32 (Hill, J., concurring).

Third and most troubling, under the Lucases' broad interpretation of who may be a prospective adoptive parent, any number of persons might file petitions and become entitled to temporary placement until the various competing petitions were resolved in a final showdown.[14] But adoption is not a bidding process, and the courts are not auctioneers. Such a scheme would bring chaos into the field of child placement and adoption. Accordingly, we decline to so construe the statute.

The Legislature should define the statutory term "prospective adoptive parent", clearly setting forth the prerequisites to becoming one. We suggest that when a child has been com-

---

[14]It is difficult to imagine anything more detrimental to the best interest of a child than multiple temporary placements. *Cf. In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980) (admonishing that "multiple changes in custody as a result of judicial proceedings are to be avoided if this is possible without harm to the child").

mitted to the care of an agency for the purpose of adoption planning, a would-be petitioner may maintain an adoption proceeding only in two circumstances: (1) if the custodian consents; or (2) when consent is not forthcoming, then only if the child had been at some point placed in the would-be petitioner's care.[15]

There may be other circumstances in which one who lacks agency sponsorship may obtain leave to file a petition. The burden should be on that party to convince a trial court that the custodian's preadoptive planning, entitled to a presumption of correctness, is so utterly devoid of merit as to constitute an arbitrary and capricious exercise of authority, or that the custodian has abdicated its authority by failing to take any preadoptive planning measures whatsoever.

Although in part II of this opinion we resolved this appeal on existing statutory grounds, were we to decide the issue under the foregoing principles, we would still dismiss the Lucases' petition. DSHS has selected a course of preadoptive planning for G.C.B. with another couple and hence has refused to consent to the Lucases' petition. Furthermore, after G.C.B was placed in DSHS' legal custody for purposes of adoption planning, the agency never placed G.C.B. with the Lucases. Finally, there is no evidence that the Department's exercise of its authority has been arbitrary and capricious. Thus, we would conclude that this blatant attempt to circumvent the legitimate exercise of the Department's custodial authority is utterly devoid of merit, and therefore that the petition should have been dismissed.

WEBSTER, C.J., and BAKER, J., concur.

Review denied at 124 Wn.2d 1019 (1994).

---

[15]The latter situation, which we presume will arise less frequently than the former, was present in several reported Washington cases. *See, e.g., In re Adoption of Infant Boy John Doe, supra; Reinius ; In re Adoption of Baby Girl Doe*, 45 Wn.2d 644, 277 P.2d 321 (1954); *State ex rel. Van Cleave v. Frater*, 21 Wn.2d 231, 150 P.2d 391 (1944).