[No. 41355-8-II.   Division Two.   June 26, 2012.]

*In the Matter of the Adoption of* S.H.

86

*Kenneth Lambrecht* and *Betty Lambrecht*, pro se.

*Robert M. McKenna, Attorney General*, and *Karen M. Dinan, Assistant*, for respondent.

¶1 PENOYAR, J. — Kenneth and Betty Lambrecht[1] cared for their great-granddaughter, SH,[2] from when she was three months old until she was four and a half years old. Two weeks before finalizing their adoption of SH, the Department of Social and Health Services (Department) removed SH from the Lambrechts' home in response to a report of a physical altercation between Kenneth and KH, SH's half-brother.

¶2 After the Department withdrew its consent to the adoption, the Lambrechts petitioned to adopt SH. At trial, the Lambrechts presented evidence showing that SH had a strong bond with them; that they had the financial and physical ability to care for SH; that they could care for SH's emotional, psychological, and developmental needs; and that the preplacement report author and SH's guardian ad litem believed that the Lambrechts should be allowed to adopt SH. The trial court granted the Department's motion to dismiss, concluding that the Department's preadoptive planning was not arbitrary and capricious and that the Lambrechts failed to establish a prima facie case that adopting SH would be in her best interest.

¶3 Our Supreme Court has rejected applying the arbitrary and capricious standard to adoption petitions, holding that the trial court must determine the child's best interest. Viewing the evidence in the light most favorable to the Lambrechts, they presented a prima facie case that adopting SH would be in her best interest. Accordingly, we reverse and remand with instructions to expedite the subsequent proceedings.

## FACTS

¶4 In September 2004, when SH was three months old, she and her two older half-brothers, KH and ZH, were

---

[1] For clarity, we refer to the Lambrechts by their first names. We intend no disrespect.

[2] We refer to all juveniles in this opinion by their initials.

placed with the Lambrechts, their great-grandparents, in their home in Vancouver. The Lambrechts obtained foster parent licenses in May 2005. SH became a dependent child in August 2005, and she remained with the Lambrechts. By August 2007, SH's parents relinquished their parental rights.

¶5 The Department completed a home study, recommending that the Lambrechts adopt SH. The home study noted that the Lambrechts had a strong bond with SH; that they provided her "the critical components of continuity, family history, love and stability"; that the Lambrechts financially could care for SH; that they were in good health; and that they had a strong support system.[3] Ex. 9, at 10. The home study also recognized that Kenneth once had "swatted" SH's half-brothers. Ex. 9, at 12.

¶6 In February 2009, the Department received two referrals alleging that Kenneth had physically abused KH. It determined that the physical abuse allegation was founded and revoked the Lambrechts' foster care license. An administrative law judge found that the following occurred:

> Mrs. Lambrecht called Mr. Lambrecht into [KH's and ZH's] room to make [KH] follow her directions. Mr. Lambrecht came into the boys['] room carrying the spatula and demanded that [KH] get out of bed and follow his grandmother's instructions. When [KH] failed to comply, Mr. Lambrecht approached [KH] while yelling at him and tried to grab him. Although[ ][KH] responded by covering Mr. Lambrecht's head with a blanket and kicking at him, Mr. Lambrecht swung at him and hit him with the spatula. The spatula left a bruise. The bruise on [KH]'s leg was more than a minor temporary mark as it lasted several days.

Ex. 28, at 17. Kenneth had had neck surgery right before the spatula incident.

¶7 With the Lambrechts' approval, the Department placed KH and ZH with their biological father, where they

---

[3] The home study also noted that Krzysztof Wroblewski lived in the home on a temporary basis but that he had no criminal history.

currently reside. Both KH and ZH still visit the Lambrechts regularly.

¶8 After the Department's investigation—but before the administrative decision—it withdrew its consent to the Lambrechts adopting SH and decided to place SH with a great-aunt and great-uncle in Moses Lake. The social worker, a supervisor, and the court appointed special advocate (CASA) created a transition plan providing that only Betty could supervise SH and that Kenneth could not be alone with her.

¶9 On April 14, 2009, the Department removed SH from the Lambrechts' home and placed her in Moses Lake after receiving a referral that Betty failed to supervise SH. Because of the Lambrechts and SH's strong bond, the Department allowed the Lambrechts to have supervised visits with SH. During the first visit, SH asked to go to the bathroom and asked Kenneth to take her there. Sydney Boren, the supervisor, told him that he could take her but to not go in the bathroom. SH asked Kenneth to come in and started to whine. Kenneth went in and stood in the doorway with the door opened about six to eight inches. The receptionist knocked on the door and told Kenneth that he could not be in there but that Betty could. Betty came in and told him that he was not supposed to be in there. He went back to the visiting room. Kenneth could no longer visit SH because of this incident. Visitations between Betty and SH continued until March 18, 2010.

¶10 On November 25, 2009, the Lambrechts petitioned to adopt SH. The Department responded that the Lambrechts were not willing and able to care for SH and that the Department did not consent to the adoption.

¶11 Kenneth underwent an anger management evaluation in November 2009. The counselor concluded that Kenneth did not report "a pattern of behavior consistent with domestic violence" and that Kenneth appeared to "parent his grandson using methods that were accepted when he was a child but are not generally accepted now." Ex. 12, at

1-2. The counselor opined that Kenneth displays "a pattern of a lack of impulse control." Ex. 12, at 2. At the counselor's recommendation, Kenneth completed anger management counseling.

¶12 On March 29, 2010, the Department moved SH from her great-aunt and great-uncle to foster care at the great-aunt's request. On April 12, 2010, the Department discontinued visitations with any relative, including Betty, because SH's therapist, Debora Holt, was concerned about the "chaos that continues to surround this child." Ex. 20, Attach. C. Holt explained that the decision was made "by us that it was in her best interest to have a peaceful period of time until the Department could decide where this child was going to be placed." Ex. 17, at 49. Holt's letter makes no mention of Betty. Julie Pettit, the social worker, also told Betty that her contact with SH's current foster home was unacceptable and would not be tolerated.

¶13 Following an allegation from the great-aunt and great-uncle that Kenneth showered with SH and slept in the nude, he requested and underwent a psychosexual evaluation in May 2010. Kenneth denied sleeping in the nude but admitted that when SH was younger, he showered with her. The evaluation found no evidence of mental illness or personality dysfunction.

¶14 On July 15, 2010, Claude Blair, who worked for the Clark County Juvenile Court, filed his preplacement report. He recognized Kenneth's alleged abuse against KH but nonetheless recommended that SH be placed with the Lambrechts.

¶15 At trial, Pettit testified the Department withdrew its consent for the Lambrechts to adopt SH for four reasons:

- Kenneth was found to have committed physical abuse of a child and thus was disqualified from adopting a dependent child.
- The Lambrechts were not able to identify the developmental needs of SH.

- The Lambrechts failed to ensure that SH received regular medical care and her immunizations.

- The Lambrechts did not enroll SH in preschool or an early intervention program as requested by the Department.

¶16 Regarding the "founded" physical abuse, Pettit added that there had been another referral in 2007, resulting in the Lambrechts signing a compliance agreement that they would not use physical punishment on a dependent child. 1 Report of Proceedings (RP) at 49. Regarding the medical care and immunizations, Pettit admitted that she had no knowledge whether SH received medical care while she lived with the Lambrechts. She noted that SH had not had immunizations and admitted that the Department was tasked with monitoring all care SH received.

¶17 Regarding the preschool requirements, Pettit explained that SH should have begun preschool at age two. She stated that SH might have been at risk for special needs because she was born positive for methamphetamine in her system. Pettit testified that SH could have attended a "headstart" program "for children that are [SH]'s age that have special needs that she could have presented." 1 RP at 45.

¶18 Blair, who completed the preplacement report, approved the Lambrechts as adoptive parents. He explained that the Lambrechts provided "a good home," that they had "the financial wherewithal to raise this child," and that they are emotionally "stable." 2 RP at 185. He opined that the Department's conclusions in its preplacement report continued to be valid.

¶19 When Blair formed his recommendation, he was aware of the finding of abuse and that SH had not received all her immunizations. He also was not sure from the Department's records that SH was socially and academically delayed. He noted that while the "founded" finding of physical abuse raised a red flag, it "doesn't necessarily preclude an adoption." 2 RP at 205.

¶20 Dr. Landon Poppleton, a clinical psychologist, saw no indication that a bond did not exist between SH and the Lambrechts, though he did not know if the bond existed at the time of trial.[4] In his report, Dr. Poppleton noted that SH's behavior became disruptive after she was removed from the Lambrechts, which could be due to attachment problems. Dr. Poppleton could not make a recommendation regarding placement, but he concluded that there should be some contact between SH and the Lambrechts.[5]

¶21 Judy Fortlage, SH's guardian ad litem in the dependency matter, was appointed as the CASA in January 2006. Fortlage noticed that SH's speech appeared to be delayed and that she may have been developmentally behind, but Fortlage watched and waited to see what happened. She made no recommendations for developmental intervention. She never recommended that SH see a therapist or psychologist. While Fortlage did not know that SH had not received immunizations, she did not see any medical problems. She had concerns about SH's mother being addicted to drugs and that symptoms might arise later. Fortlage had not seen any symptoms from SH being born drug addicted.

¶22 Fortlage began having concerns about how KH and ZH were doing in the Lambrechts' house in mid-2008. KH was diagnosed with ADHD (attention deficit/hyperactivity disorder) with a hyperactivity component. Fortlage was concerned that the Lambrechts did not fully comprehend how KH's ADHD affected his behaviors. Fortlage did not think that KH and ZH were receiving all the services that they needed. ZH refused to talk to a therapist, so he stopped attending those sessions. KH saw many therapists and missed appointments. After KH "explode[d]," Fortlage rec-

---

[4] The Department has never disputed that there was a bond between SH and the Lambrechts.

[5] Dr. Poppleton attempted to contact Debora Holt, SH's therapist, and a visitation supervisor, but both refused to talk to him. In his report, he wrote that the mental health providers "stonewalled" him from obtaining information. Ex. 24, at 6. Holt refused to talk to Dr. Poppleton because she "[chose] not to be involved in the drama that's going on around this kid." Ex. 17, at 88.

ommended that KH receive more therapy, which he did through Catholic Community Services. 5 RP at 651. Fortlage believed that the Lambrechts did not pick their battles and break down tasks for KH and ZH.

¶23 Fortlage was concerned about SH because of the tension in the house, stating that SH said something angry to KH, which was out of character for her. After KH and ZH were removed from the Lambrechts' home, Fortlage recommended that the Lambrechts still adopt SH. She now recommends that they not adopt her.

¶24 Mary Hatzenbeler, SH's guardian ad litem in the adoption proceedings, recommended that SH be returned to the Lambrechts. Hatzenbeler believed that the Lambrechts were SH's parent figures. Hatzenbeler became alarmed when the foster mother told Hatzenbeler that SH was "one of the most compliant children I have ever met." 6 RP at 700. Hatzenbeler testified that removing a child from a home and a parental figure is extremely disruptive. Hatzenbeler also opined that Holt acted inappropriately when she talked to SH about not going back to the Lambrechts' home.

¶25 While Hatzenbeler visited, SH, who was six years old, climbed up on the foster mother's lap, curled up, and started sucking her thumb when Hatzenbeler first mentioned Vancouver. Hatzenbeler noted that SH clinging to her foster parent and sucking her thumb showed that she is developmentally behind and has probably regressed since when she was removed from the Lambrechts' home.

¶26 SH made no mention of the Lambrechts. Hatzenbeler asked SH to draw a picture of her family, and SH drew her foster family. The pictures were primitive relative to her age. SH told Hatzenbeler that she was happy staying with her foster family.

¶27 Hatzenbeler saw no evidence that SH had ever been abused in any way or that there was any family disharmony during the supervised visits. SH was excited to see Betty, and they enjoyed their visits.

¶28 Both the aunt and the foster mother reported to Hatzenbeler that SH hit, spit, and bit while in their homes, but that there was no such report by the Lambrechts. Hatzenbeler was concerned that the move to Moses Lake and multiple placements were going to take SH years to get over and require a lot of therapy and ongoing services. She explained her frustration with the Department's decisions to not allow SH to see her family:

> It's beyond my conscious way of dealing with things to completely sever a child, unless it is absolutely necessary for their safety, and I didn't see anything in these records that said it was absolutely necessary in this case to completely sever the relationship that she had with the people who had raised her from birth. If there was any concern that she might ever be spanked, that certainly would be something that could easily be part of a reunification plan.
>
> . . . .
>
> The immunization, the preschool, all of these things that had already occurred before she was ever removed from the home, which are now concerns, seem like they're trying to make the removal fit now where it didn't fit before. And that concerns me, and that's why I think it's unconscionable.

6 RP at 733-34.

¶29 Hatzenbeler explained her recommendation that SH be reunified with the Lambrechts:

> My recommendation continues to be that she be returned to the Lambrecht's [sic]. If there are any concerns that the Department continues to have, I think the Department could easily work with the Lambrecht's [sic] to rectify and reunify this family. I've seen it happen in other cases. I cannot, for the life of me, understand why there was not attempt—there has been no attempt for reunification. It has just gone from bad to worse, from what I have seen. And from the reports of Deborah Holt [SH's therapist], her behavior is still up and down. She appeared to be quite comfortable when I saw her with [the foster mother], but it's my understanding that that would be typical for a child who has been moved around that she, she's

been traumatized and she's got to have some rock to hang onto, and at least she's in a place now where she's got a calm mother figure that is used to dealing with lots of situations. . . . I think she should be returned to the Lambrecht's [sic] as soon as possible.

6 RP at 735-36.

¶30 Hatzenbeler did not believe that the allegation of Kenneth spanking KH with the spatula warranted removal or that the immunization issue should preclude adoption. She was concerned that the Lambrechts gave false information about the immunizations, but the Department had access to that information. She opined that SH was so compliant with her foster parents because "she figures that she's got a port in the storm and she doesn't know what else there might be out there if she messes this one up." 6 RP at 788.

¶31 Regarding the Lambrechts' ability to meet SH's emotional, physical, and psychological needs, Hatzenbeler had not heard "any testimony that indicates that they weren't doing that." 6 RP at 790. She also did not see any medical records indicating a need for SH to attend pre-school beginning at age two.

¶32 Kenneth testified that he worked in real estate and financial services. He was involved in the local Catholic church. He first met SH when she came home with Betty from the hospital. The hospital claimed that SH tested positive for methamphetamine, though he could not verify that. He doubted that she was affected because she slept all night.

¶33 Kenneth testified that KH attended counseling and received special counseling, but KH was prone to outbursts, resulting in suspensions at school. Kenneth had heard that KH threatened to hit him with a baseball wrapped in barbed wire. Since KH and ZH moved out, they still visit the Lambrechts regularly, but Kenneth tries to limit his contact with them to avoid false accusations.

¶34  To discipline SH, Kenneth gave her a stern look or spoke to her a little roughly, and she would comply. Kenneth recognized that as a licensed foster parent, it was against the Department's policy to use physical discipline.

¶35  Betty testified that they were meeting SH's emotional, psychological, and social developmental needs. She claimed that SH was a happy child and that she needed very little discipline. She considered herself SH's parent.

¶36  SH would go to preschool or day care some days and spend Fridays with Kenneth. A caseworker told Betty to take SH to day care so that she could have some relief or a respite when SH was two years old, but she was not told to place SH in preschool. Betty claimed that no Department representative discussed preschool socialization skills with her.

¶37  Betty admitted that she did not get all of SH's immunizations. Betty made sure she received medical care as needed. Staff told Betty that SH did not need another immunization and that they would notify her when SH was due for the next shot. Betty admitted signing a document claiming an exemption to immunization for religious reasons, though her religion did not forbid immunizations. Betty did not contact the social worker to discuss the exemption. She signed the document because the school's staff told her to sign it so that they would not have to ask for immunization records. The Department's personnel did not mention immunizations while Betty cared for SH. They also did not mention concerns about SH having developmental or socialization delays. Betty added that they took SH to her physician, with the caseworker's approval, and he did not give immunizations. On one occasion, SH had bronchitis and they took her to the doctor.

¶38  Betty admitted signing the transition safety plan and that if she violated the terms, SH could be removed sooner from the home. She did not seek clarification from the social worker of what the plan meant. She was not told

that Wroblewski could not supervise SH, so he supervised SH when Kenneth was present.

¶39 Betty testified that SH never lost energy or a connection with Betty during the visitations. SH occasionally would ask to do something different than what Betty proposed, but SH did not get bossy or argumentative. During one visitation, SH told Betty about a plane trip to Arizona.[6] SH said she had looked out of the plane and saw Betty waving at her. They also had weekly phone calls, but SH would cry at the end, so Betty and Kenneth's contacts were reduced from weekly to once a month. If SH cried, they would not be allowed to talk to her at all.

¶40 Betty has also seen SH's kindergarten report card. SH was improving and was average. Before the end of kindergarten, SH was removed from public school to be homeschooled by her foster mother. This was done out of a concern that SH might fail first grade.

¶41 Betty admitted contacting SH's current foster mother after SH was placed with them. She did not ask the social worker if she could contact the foster mother. Betty did not have another visit with SH after that incident.

¶42 Holt, SH's therapist, first saw SH when SH transitioned to her great-aunt and great-uncle's care. Holt initially diagnosed SH with adjustment disorder with depression and anxiety. She had a fear of separating from the great-aunt.

¶43 During meetings, SH appeared impulsive, argumentative, and dismissive. She also was withdrawn and restless. She was about a "three-year-old level." Ex. 17, at 13. She acted "more infantile and needed people to do things for her, like carry her around and tie her shoes." Ex. 17, at 22. Holt changed the diagnosis to oppositional and defiant disorder, and eventually upgraded to oppositional defiance disorder.

---

[6] This trip was for the purpose of meeting a family member interested in adopting SH. SH did not mention this fact during her story.

¶44 SH was excited about being in kindergarten, but the great-aunt reported she was on the low end developmentally. SH would do the silent treatment or defy requests during sessions and at home, but she was not displaying those behaviors at school. During one session, SH sat in the chair, turned to the wall, and refused to engage. They eventually talked about a trip to Arizona, but there was little engagement.

¶45 SH missed the Lambrechts and would not talk much about them. During one session after discussing her pending removal from her great-aunt's house, SH said that she missed the Lambrechts and wanted to live with them. Holt told SH that she could not live with them.

¶46 The great-aunt left a voice message for Holt, telling her that SH was threatening to kill her and hitting the family dog. SH bit the great-aunt at church, and it was impossible to make SH do her homework. The great-aunt and great-uncle could not care for SH, so Holt worked with the Department to find a new placement, including an aunt in Arizona.

¶47 After SH was placed with her current foster parents, SH was quiet about the move. The foster mother said that SH had no behavioral problems.

¶48 After Holt sent the letter stopping all family visitations, SH talked more to Holt. She was now home schooled, and she began to exhibit the same excitement as when she saw Betty. SH had an incident with the foster mother where she was spitting, hitting, and punching, but the foster mother sat down and rocked SH. During sessions, SH did well when the foster parent was present, but she was less interactive when alone with Holt. SH told Holt that she wanted to live with her foster parents. She was six years old. Holt dropped the oppositional defiance disorder diagnosis. Holt did not believe that the move to the foster family erased the bonds that SH had with the Lambrechts.

¶49 Sydney Boren was the parent educator and visitation supervisor. She supervised the Lambrechts' visitations with

SH. She testified that SH was happy to see her great-grandparents and enjoyed her time with them. After the first visit, Boren wrote a letter explaining the bathroom incident, which served as the basis to end Kenneth's visitations.

¶50 During subsequent visits, Boren was concerned that Betty did not discipline or set limits for SH when she was being difficult. Betty would stay calm and not raise her voice. When Betty brought up the trip to Arizona, SH became oppositional and disputed almost everything Betty said. SH did relate the story about seeing Betty from the airplane.

¶51 Boren signed the letter recommending that SH not visit her family. She explained that SH's demeanor changed from happy to demanding, bossy, and defiant during the visitations. She testified that one of the reports describing the bossiness appeared to be altered by someone other than herself.

¶52 At the conclusion of the Lambrechts' case in chief, the Department moved to dismiss the adoption petition under CR 41(b)(3) for failure to establish a prima facie case. The court granted the motion. As relevant here, the court found (1) that there "was no evidence that the Lambrechts would be able to meet [SH]'s needs"; (2) that the Lambrechts "failed to ensure that [SH] received regular medical care, including well child doctor visits and immunizations"; (3) that they "failed to ensure that [SH] attend preschool on a regular basis to address any educational or developmental concerns"; (4) that SH experienced "chaos in her life before being removed from the Lambrechts" because she lived "in a home where a brother was stabbing another brother with a pen, there were holes in the walls, a mattress was set on fire and the oldest brother had threatened to kill Mr. Lambrecht"; and (5) that the Lambrechts "failed to request help or participate in those services that would have helped the [older siblings'] behaviors." Clerk's Papers (CP) at 279.

¶53 The court ruled that no evidence showed that the Department's actions were arbitrary and capricious. It ruled that the Lambrechts "failed to establish a prima facie case that the granting of their adoption petition would be in the best interest of" SH. CP at 280. The court dismissed the petition with prejudice. The Lambrechts now appeal.

## ANALYSIS

### I. STANDARD OF REVIEW

■■ ¶54 CR 41(b)(3) provides that in a bench trial, the court may grant a motion to dismiss at the close of the plaintiff's case either as a matter of law or as a matter of fact.[7] Under CR 41(b)(3) dismissal is appropriate " 'if there is no evidence, or reasonable inferences therefrom, that would support a verdict for the plaintiff.' " *Commonwealth Real Estate Servs. v. Padilla*, 149 Wn. App. 757, 762, 205 P.3d 937 (2009) (quoting *Willis v. Simpson Inv. Co.*, 79 Wn. App. 405, 410, 902 P.2d 1263 (1995)). A trial court "may either weigh the evidence and make a factual determination that the plaintiff has failed to come forth with credible evidence of a prima facie case, or it may view the evidence in the light most favorable to the plaintiff and rule, as a matter of law, that the plaintiff has failed to establish a prima facie case." *In re Dependency of Schermer*, 161 Wn.2d 927, 939, 169 P.3d 452 (2007). If the trial court dismisses the case as a matter of law after the plaintiff rests,

---

[7] CR 41(b)(3) provides:

After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subsection and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under rule 19, operates as an adjudication upon the merits.

"review is de novo and the question on appeal is whether the plaintiff presented a prima facie case, viewing the evidence in the light most favorable to the plaintiff. But if the trial court acts as a fact-finder, appellate review is limited to whether substantial evidence supports the trial court's findings and whether the findings support its conclusions of law."

*Padilla*, 149 Wn. App. at 762 (quoting *Schermer*, 161 Wn.2d at 939-40).

¶55 Entering findings strongly suggests that the trial court weighed the evidence because no findings or conclusions are required when the court views the evidence in the light most favorable to the plaintiff and rules as a matter of law. *Schermer*, 161 Wn.2d at 940. To determine whether the trial court granted the CR 41(b)(3) motion by weighing the facts as compared to ruling as a matter of law, appellate courts look to the context of the oral ruling and order. *Schermer*, 161 Wn.2d at 940-41.

¶56 In *Schermer*, the trial court granted a CR 41(b)(3) motion, ruling that there was no evidence from which a rational trier of fact could conclude that the child was dependent. 161 Wn.2d at 937-38. The trial court deliberately refused to weigh the evidence in its oral ruling and crossed out references to findings of fact and entered conclusions of law in its order. *Schermer*, 161 Wn.2d at 938, 940. The Supreme Court held that the trial court ruled as a matter of law, so review was de novo, viewing the evidence in the light most favorable to the plaintiff. *Schermer*, 161 Wn.2d at 941.

¶57 Here, although the trial court entered findings of fact, its oral ruling and order indicates that the court decided that the Lambrechts failed, as a matter of law, to establish a prima facie case. Both the oral ruling and the order state that the trial court relied on the case of *In re Dependency of G.C.B.*, 73 Wn. App. 708, 870 P.2d 1037 (1994), that the court must "find if there's any evidence of the Department being arbitrary and capricious." 7 RP at 867. It found none. And the court did not make any explicit

credibility findings, ruling only that the Lambrechts "failed to establish a prima facie case that the granting of their adoption petition would be in the best interest of" SH.[8] CP at 280. While the trial court's approach is less faulty than in *Schermer*, we conclude that the trial court ruled as a matter of law that the Lambrechts failed to establish a prima facie case. Thus, our review is de novo, viewing the evidence in the light most favorable to the Lambrechts. *Schermer*, 161 Wn.2d at 941.

II. APPLICABLE LAW

■ ■ ¶58 Adoption is a creature of statute, and the statutes must be strictly followed. *In re Adoption of B.T.*, 150 Wn.2d 409, 416, 78 P.3d 634 (2003). The intent of the statute is "to provide stable homes for children," so the guiding principle is to determine what is in the best interest of the child. RCW 26.33.010; *B.T.*, 150 Wn.2d at 416. Any person who is legally competent and is 18 years old or older may be an adoptive parent. RCW 26.33.140(2). When filing the adoption petition, the prospective adoptive parent must file the written consent by necessary parties, including the Department, for the adoption. RCW 26.33.150, .160. When the child is dependent, the Department's consent is required. RCW 13.34.210; RCW 26.33.160(1).

■ ¶59 Once a preplacement report is filed, the court shall enter an adoption decree determining, after reviewing the petition, preplacement and postplacement reports, and other evidence, and that all necessary consents are valid or have been dispensed with and that the adoption is in the child's best interest. RCW 26.33.240. The Department's consent to the adoption may be dispensed with if the court determines by clear, cogent, and convincing evidence that the proposed adoption is in the child's best interest. RCW 26.33.170(1).

---

[8] At first, the Department does not argue that the trial court weighed the evidence but merely argues that the result is the same regardless of the standard of review. The Department later argues that the trial court weighed the evidence and could not conclude that the adoption was in SH's best interest.

III. The Trial Court Applied the Wrong Standard to the Department's Decision

¶60 The trial court ruled, and the Department now argues on appeal, that *G.C.B.* requires the party seeking to adopt to prove that the Department's preadoptive planning, entitled to correctness, "is so utterly devoid of merit as to constitute an arbitrary and capricious exercise of authority," or that the Department had abdicated its authority by failing to take any preadoptive measures. *G.C.B.*, 73 Wn. App. at 723. The Lambrechts correctly point out that our Supreme Court has explicitly declined to follow that standard.

¶61 In *B.T.*, the court recognized that *G.C.B.* suggested that a would-be petitioner could maintain an adoption in three circumstances: (1) if the Department consents, (2) if consent is not forthcoming and if the child had been at some point placed in the would-be petitioner's care, and (3) if the Department's preadoptive planning is so utterly devoid of merit as to constitute an arbitrary and capricious exercise of authority or if the custodian fails to take any preadoptive planning measures whatsoever. *B.T.*, 150 Wn.2d at 418 (discussing *G.C.B.*, 73 Wn. App. at 723). The *B.T.* court held that "we must look to the statute. We are not obligated to take into account the *G.C.B.* definition of 'prospective adoptive parent' because it is dicta." *B.T.*, 150 Wn.2d at 418. The court explained that by following *G.C.B.*, the trial court had undermined the legislature's intent to always consider the child's best interest. *B.T.*, 150 Wn.2d at 419. The court later added that the trial court's role is to determine the child's best interest. *B.T.*, 150 Wn.2d at 419.

¶62 Here, the trial court incorrectly relied on *G.C.B.* in both its oral ruling and its order. The court focused on *G.C.B.* in its oral ruling, concluding that the Lambrechts failed to meet their burden of proof:

[T]he *Dependency of G.C.B.*, controls. "The legislature should define the statutory term prospective adoptive parent, clearly

setting forth the prerequisites to become one. We suggest that when a child has been committed to the care of an agency for the purpose of adoption planning, a would-be petitioner may maintain an adoption proceeding only under two circumstances: One, that the custodian consents." They do not. "Two, when consent is not forthcoming, then only if the child has been at some point placed in the would-be petitioners' care," that at this point they were, they are not (sic). And I have to find if there's any evidence of the Department being arbitrary and capricious. The Department is not arbitrary and capricious when denying consent to adoption for a family they have found violating conditions of their foster license. That's extremely important in this case. If the Lambrecht's [sic] are found not to be fulfilling their duties as foster parents, then how can I possibly put a child in their home for adoption? I cannot.

7 RP at 867-68. Consistent with the oral ruling, the court's order also improperly focused on *G.C.B.*:

The case of *Dependency of G.C.B.*, 73 Wn. App. 708, 870 P.2d 1037 (1994) is controlling. The petitioners had the burden to convince the court that DSHS' preadoptive planning, entitled to a presumption of correctness, was so utterly devoid of merit as to constitute an arbitrary and capricious exercise of authority. There is no evidence that DSHS' actions were arbitrary and capricious.

CP at 280.

¶63 The trial court incorrectly applied the *G.C.B.* standard, which the Supreme Court has rejected. Although the trial court applied the incorrect standard, it also concluded that the Lambrechts failed to establish a prima facie case that granting their adoption petition would be in SH's best interest. Since this is the correct standard, we must analyze whether that conclusion is correct.

IV. THE LAMBRECHTS ESTABLISHED A PRIMA FACIE CASE THAT GRANTING THEIR ADOPTION PETITION WOULD BE IN SH'S BEST INTEREST

¶64 The Lambrechts argue that they presented sufficient evidence for a rational person to conclude that it was

in SH's best interest to be adopted by the Lambrechts. The Department responds that after weighing the evidence, the trial court could not conclude that the adoption was in SH's best interest. The Department argues that there was a "substantial amount of evidence presented at trial that significantly questioned the Lambrechts' ability to meet all of the child's needs." Resp't's Br. at 24-25. Viewing the evidence in the light most favorable to the Lambrechts, the Lambrechts presented a prima facie case that their adopting SH would be in SH's best interest.

■■ ¶65 Because the Lambrechts did not have the Department's consent to adopt, they must prove by clear, cogent, and convincing evidence that the adoption is in SH's best interest. RCW 26.33.170(1). The best interest of a child is a " 'highly fact-specific inquiry that cannot be reduced to a mathematical equation.' " *In re Dependency of M.R.*, 166 Wn. App. 504, 517, 270 P.3d 607 (2012) (quoting *In re Dependency of J.B.S.*, 123 Wn.2d 1, 11, 863 P.2d 1344 (1993)); *see In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). While chapter 26.33 RCW does not define a child's "best interest," it provides guidance for what the inquiry should entail. RCW 26.33.200(1) requires the court to order a postplacement report analyzing the nature and adequacy of the placement and whether the placement is in the child's best interest. The statute requires the report to include all reasonably available information regarding "the physical and mental condition of the child, home environment, family life, health, facilities and resources of the petitioners, and any other facts and circumstances relating to the propriety and advisability of the adoption." RCW 26.33.200(1). The report shall also include, when relevant, the child's special cultural heritage information. RCW 26.33.200(1). The underlying purpose of these statutes is "to provide stable homes for children. . . . The guiding principle must be determining what is in the best interest of the child." RCW 26.33.010.

¶66 Here, viewing the evidence in the light most favorable to the Lambrechts, they established a prima facie case

that they could prove by clear, cogent, and convincing evidence that adopting SH would be in her best interest. Blair and Dr. Poppleton opined that SH formed a strong bond with the Lambrechts, and the Department does not dispute that there was a strong bond. Holt, SH's therapist, even agreed that SH's move to the foster family likely did not erase the bonds that SH had with the Lambrechts. The Department initially consented to the Lambrechts adopting SH but withdrew that consent two weeks before the adoption was finalized. Blair, who conducted the home study, testified that the Lambrechts had the financial means to care for SH and that they could provide an emotionally stable setting for SH. He made this recommendation even though he knew that there was a finding of abuse and that SH had not received all of her immunizations. Hatzenbeler, SH's guardian ad litem, opined that the Lambrechts were SH's parent figures and recommended that SH be returned to the Lambrechts. She saw no evidence that the Lambrechts were unable to meet SH's emotional, physical, and psychological needs. Viewing the facts in the light most favorable to the Lambrechts, they presented evidence establishing that SH bonded with them; that they could care for SH's financial, emotional, and psychological needs; and that they were SH's parent figures. The trial court erroneously ruled that the Lambrechts failed to establish a prima facie case.

¶67 The Department argued that the trial court should not grant the adoption petition because (1) Kenneth had a finding of physical abuse, (2) the Lambrechts could not identify SH's developmental needs, (3) the Lambrechts failed to ensure that SH received regular medical care and immunizations, and (4) the Lambrechts failed to enroll SH in preschool at age two. While there certainly is evidence supporting the Department's arguments, its effect cannot be determined without weighing it against the Lambrechts' evidence. Viewing all of the evidence in a light most favorable to the Lambrechts, we cannot say that it excludes

a finding that the Lambrechts have met their burden to show by clear, cogent, and convincing evidence that adopting SH would be in her best interest.

¶68 First, regarding the physical abuse finding, Blair and Hatzenbeler both testified that the finding does not automatically preclude the Lambrechts from adopting SH. While the Department posits that its policy states that a party whose foster license has been revoked may not adopt a child, the Department cannot point to the specific policy, and there appears to be no statute or administrative rule stating as much. Moreover, viewing the administrative law judge's ruling in the light most favorable to the Lambrechts, Kenneth acted in self-defense and did not intentionally cause harm to KH. He also does not show a pattern of domestic violence. And there is no evidence that either Kenneth or Betty ever used corporal punishment on SH.

¶69 The Department then argues that the Lambrechts were unwilling to follow its rules by using corporal punishment, by failing to complete the training required as foster parents, and by allowing Wroblewski to live in the house without telling the Department. The Lambrechts stated that they did not use corporal punishment, and with the exception of a 2007 incident, which the Department knew about, and the spatula incident with KH, which the Lambrechts claim was self-defense, there is no other evidence of corporal punishment. There also is no evidence that the Lambrechts used corporal punishment on SH; the evidence shows that they would discipline her by giving her a stern look or harsh voice. On the foster parent training issue, there is no evidence that training was required to adopt SH. And the Department revoked the Lambrechts' license before they completed the training. As for Wroblewski living with the Lambrechts, the Department knew he lived with the Lambrechts, as evidenced by the home study, which still recommended that the Lambrechts adopt SH.

¶70 Second, regarding SH's developmental delays, Fortlage testified that SH might have been somewhat delayed

when she lived with the Lambrechts, but Fortlage made no recommendations for developmental intervention. She never recommended that SH see a therapist or psychologist. While Fortlage had concerns that SH might be affected by her mother exposing her to drugs, she saw no indications that SH had symptoms from being born drug-addicted. Contrary to the Department's argument that the Lambrechts did not recognize that SH was exposed to methamphetamine at birth, they, like Fortlage, did not see any symptoms from being born drug-addicted.

¶71 Dr. Poppleton opined that SH's behavior became disruptive after she was removed from the Lambrechts, which could be due to attachment problems. Hatzenbeler testified that there was no evidence that the Lambrechts could not meet SH's emotional, physical, and psychological needs. She believed that SH probably regressed developmentally when she was removed from the Lambrechts' home.

¶72 Betty confirmed that they were meeting SH's emotional, psychological, and social developmental needs, and that the Department's personnel never mentioned concerns about SH having developmental or socialization delays. Viewing the facts in the light most favorable to the Lambrechts, they were not failing to identify SH's developmental needs.

¶73 Third, the Department argues that the Lambrechts failed to ensure that SH received medical care and immunizations. Betty admitted that she did not get all of SH's immunizations, but she made sure that SH received medical care as needed. When Betty took SH to the doctor when she was just over a year old, the staff told her that they would notify her when SH was due for the next shot. Betty took SH to her physician, with the caseworker's approval, and the doctor did not give immunizations. Department personnel never mentioned immunizations. While Betty admitted signing a document claiming an exemption to immunization, she signed the document because the

school's staff told her that they would not have to ask for the immunizations. Pettit admitted that she had no knowledge that SH did not receive medical care while she lived with the Lambrechts.

¶74 Blair testified that he knew that SH had not received all of her immunizations when he completed the preplacement report, but he still concluded that the Lambrechts should adopt SH. Hatzenbeler did not believe that the immunization issue should preclude the Lambrechts from adopting SH. She noted that the Department had access to that information. Viewing these facts in the Lambrechts' favor, they obtained medical care as needed and the failure to ensure SH received her immunizations does not mean that adopting SH would not be in her best interest.

¶75 Fourth, the Department argues that the Lambrechts failed to enroll SH in preschool when she was two years old. Pettit testified that the Lambrechts had been asked in court hearings to obtain preschool for SH since 2006. She stated it became a concern when SH was two years old. When pressed by the Lambrechts as to whether they had been tasked to enroll SH in the preschool developmental programs through the public schools, Pettit responded, "Not even that. It could be headstart, which has open spots for children that are [SH]'s age that have special needs that she could have presented." 1 RP at 45.

¶76 Betty testified that a caseworker told Betty to take SH to day care so that Betty could have some relief or a respite when SH was two years old. Betty was never told to place SH in preschool. No Department personnel discussed preschool socialization skills with her, and she eventually placed SH in day care. Viewing the facts in the light most favorable to the Lambrechts, the Department did not recommend preschool for socialization skills but only as a respite for Betty.

¶77 The trial court appears to have based its decision on the Lambrechts' interaction with KH and ZH, finding that

SH experienced chaos living in a home with her half-brothers. The Department echoes this concern, arguing that SH lived in a poor environment. On the other hand, there is no evidence (1) that SH was present during any of the incidents, (2) that the Lambrechts used corporal discipline on SH,[9] or (3) that either KH or ZH were physically violent toward SH. And both KH and ZH were removed from the Lambrechts' house, with their approval, so SH would not live in that environment. As for the trial court's finding that the Lambrechts failed to request services or participate in services that would help address KH's and ZH's behaviors, this is not supported by the evidence. Fortlage testified that both KH and ZH attended therapy, but ZH refused to talk, and KH saw many therapists but missed appointments. When Fortlage recommended that KH receive more therapy, KH continued therapy through Catholic Community Services.

¶78  Viewing the evidence in the light most favorable to the Lambrechts, they presented a prima facie case that clear, cogent, and convincing evidence proved their adopting SH would be in her best interest. The trial court erroneously granted the Department's motion to dismiss.[10]

¶79  We reverse and remand. In light of the importance and the need to finally adjudicate SH's adoption, we instruct the trial court to expedite subsequent proceedings on remand.

WORSWICK, C.J., and VAN DEREN, J., concur.

---

[9] KH reported that SH had been spanked but that was dismissed.

[10] Because we hold that the trial court erroneously dismissed the case, we need not address the Lambrechts' argument that they have a constitutionally protected liberty interest in family integrity and association as SH's psychological or de facto parents.